**Richard EIZENGA, Individually and on Behalf of all Others Similarly Situated**

v.

**STEWART ENTERPRISES, INC. et al.**

Civil Action Nos. 99–2572, 99–2672, 99–2753, 99–2601, 99–2687, 99–2773, 99–2663, 99–2716, 99–2858, 99–2864, 99–2915, 99–2888, 99–3043, 99–2891, 99–3084.

United States District Court, E.D. Louisiana.

Dec. 6, 2000.

E. Rader Jackson, Jackson & McPherson, LLC, New Orleans, LA, James V. Bashian, Oren S. Giskan, Law Offices of James V. Bashian, PC, New York City, for Richard Eizenga.

R. Patrick Vance, Thomas K. Potter, III, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, Peter E. Kazanoff, Paul C. Curnin, Michael J. Chepiga, Simpson, Thatcher & Bartlett, New York City, for Stewart Enterprises, Inc., Frank B. Stewart, Jr., William E. Rowe, Joseph P. Henican, III.

George C. Freeman, III, Stone, Pigman, Walther, Wittmann & Hutchinson, LLP, New Orleans, LA, Joseph S. Allerhand, Stephen A. Radin, Weil, Gotshal & Manges, New York City, for Merrill Lynch & Co., Johnson Rice & Company L.L.C.

### ORDER AND REASONS

LEMMON, District Judge.

**IT IS HEREBY ORDERED** that the motion of Stewart Enterprises, Inc., Frank B. Stewart, Jr., William E. Rowe, and Joseph P. Henican, III to dismiss the complaint for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, is **GRANTED.** (Document # 17).

**IT IS FURTHER ORDERED** that the Rule 12(b)(6) motion of Bear, Stearns & Co., Inc.; Merrill Lynch & Co.; and Johnson Rice & Company L.L.C. to dismiss the complaint for failure to state a claim is **GRANTED.** (Document # 18).

## I. OVERVIEW

Before the court are Rule 12(b)(6) motions to dismiss a consolidated amended complaint by two shareholder classes against a corporation, certain corporate officers individually, and the underwriters who prepared the prospectus and the registration statement for a secondary offering, containing statements allegedly materially false and misleading, or omitting facts necessary to make them not misleading. Defendants contend that the complaint fails to state a claim upon which relief can be granted because the identified statements were forward-looking statements and general statements of optimism protected under the safe harbor provision of the Private Securities Litigation Reform Act of 1995 (the Reform Act or PSLRA) and that the allegations fail to comply with the heightened pleading requirements of the Act.

## II. BACKGROUND

In 1910, the Stewart family founded a funeral and cemetery products and services business in Louisiana, which was incorporated as Stewart Enterprises, Inc. (the Company).

In 1991, the Company first sold shares to the public. By acquisition, between November 1, 1991, and December 31, 1998, it grew from 43 funeral homes and 29 cemeteries in six states to 575 funeral homes and 143 cemeteries in 29 states and Puerto Rico and ten foreign countries, becoming the third largest provider of funeral and cemetery products and services in North America.

Between October 1, 1998, and August 12, 1999, the period relevant to this case, Frank B. Stewart, Jr. was the chairman of the Board of Directors, William E. Rowe was the president and chief operating officer, and Joseph P. Henican, III was the chief executive officer of the Company. These officers are, collectively, "the individual defendants."

On December 15, 1998, the Company released financial results for its fiscal year

1998, showing a 32% increase over 1997 in earnings and a 21% increase in earnings per diluted share, from $.78 to $.94. One day later, the Netherlands' largest bank, ABN Amro, forecast earnings per share for fiscal year 1999 of $1.13 (quarterly, $.27, $.30, $.30, and $.26).

The Company offered for sale in a secondary offering 11,850,000 shares of its Class A common stock, and the Stewart Trust, established by Stewart and his wife, offered 650,000 shares of Class A common stock, at a public offering price of $16.75 per share. The offering was announced in an amended registration statement, a December 31, 1998 prospectus and a January 27, 1999 supplement (Exhibit A) prepared by investment bankers Bear, Stearns & Co., Inc., Merrill Lynch & Co., and Johnson Rice & Company L.L.C. (collectively, the underwriter defendants).

On February 2, 1999, the offering having been oversubscribed and the underwriters having exercised an overallotment option, 14,375,000 shares were sold. The Company realized $219,130,200 net proceeds for its 13,627,500 shares. Stewart Trust realized $12,019,800 net proceeds for its 747,500 shares.

On August 12, 1999, six months later and when the price of the stock was 10 ⅟₁₆, the Company issued a news release concerning the expected earnings estimates for the third and fourth quarters of 1999 as follows:

[The Company] expects to report earnings per share of $.25 to $.27 for the third quarter ended July 31, 1999 compared to $.25 for the same period in 1998. The Company also announced that it expects to report earnings per share of $.17 to $.19 for the fourth quarter of 1999 compared to $.22 for the same period in 1998.

Earnings per share for fiscal year 2000 are expected to increase about 5% compared to fiscal year 1999 earnings, and the Company currently anticipates earnings per share growth of 10 to 12 percent going forward from there, as compared with the 20 percent growth rates achieved in recent years. Notwithstanding those expectations, the Company stated that it will continue to initiate innovative business strategies with a goal of returning to higher sustainable growth rates. The Company anticipates announcing earnings and conducting its usual conference call for the quarter ended July 31, 1999, during the week of September 6, 1999.

In explaining the reasons for its downward revisions of anticipated growth rates, the Company stated that it believes that the fundamentals of its business and the long-term prospects of the death care industry remain strong, but recent changes in industry trends and the Company's ability to respond to those trends in the short term have caused management to revise its short and medium-term expectations.

Those trends are the intense and growing price competition from low-cost funeral providers and casket stores in selected markets, the continuing and accelerating trend toward cremation and a shift by customers to lower-priced services and merchandise, all of which have negatively affected at-need funeral revenues in certain markets. Although intense competition is normal in every facet of the death care business, the recent shortfalls in funeral revenue produced by the combination of these events have caused management to reassess their long-term implications and the Company's strategies for responding to these changing competitive conditions. Furthermore, in selected key markets such as Miami, Dallas, and Buenos Aires, the Company has not achieved preneed sales targets. As a result, management has made key sales management changes and provided additional sales support in these markets.

On the next trading day after the August 12, 1999, news release, the price of the Company stock dropped 38.5% to $6 ³⁄₁₆, and the Wall Street firm of Josephthal & Co., Inc. revised its recommendation from "buy" to "hold."

On December 1, 1999, the stock closed at $5.156 per share. On December 13, 1999, a consolidated amended class action complaint [1] was filed against the Company, the individual defendants, and the underwriter defendants on behalf of two classes of purchasers of the Company's common stock between October 1, 1998 and August 12, 1999 (the 10(b) plaintiffs and the secondary offering plaintiffs).

The secondary offering plaintiffs allege that the underwriter defendants and the individual defendants as "controlling persons" are responsible for statements in the secondary offering registration statement and final prospectus (Exhibit A) and that those statements are materially false and misleading, or omit facts that are necessary to make the statements not misleading, in violation of sections 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. § 77k, 77$l$(2), and 77o (counts one, two, and three).[2]

The 10(b) plaintiffs allege that the Company and the individual defendants, by use of the mails and in interstate commerce, participated in a continuous course of conduct to make materially false and misleading statements about the Company's financial condition, and engaged in schemes to defraud investors, in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and 78t(a) and Rule 10b–5 of the Rules promulgated by the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5 (counts four and five). The 10(b) plaintiffs allege that the Company and the individual defendants either 1) had actual knowledge of the misrepresentations and omissions of material fact or 2) acted with reckless disregard for the truth and had motive and opportunity to keep the stock's price artificially high because of the recurring need to raise new capital and their influence upon the wording of the prospectus and the registration statement. The 10(b) plaintiffs assert that the individual defendants were controlling persons within the meaning of § 20 of the Exchange Act.

The underwriter defendants filed a Rule 12(b)(6) motion to dismiss the secondary offering plaintiffs' claims in counts one and two, in which the individual defendants joined. The Company and the individual defendants filed a motion to dismiss counts one through five for failure to state a claim. Fed.R.Civ.P. 12(b)(6).

## III. DISCUSSION

### A. The standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a claim on the basis of a dispositive issue of law. Neitzke v. Williams, 490 U.S. 319, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989). The complaint is liberally construed in favor of the plaintiff, and all facts pleaded in the complaint are taken as true. See Campbell v. Wells Fargo Bank, 781 F.2d 440, 442 (5th Cir.1986). This Court does not dismiss a complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

### B. Motion to dismiss secondary offering plaintiffs' claims relating to a false registration statement under § 11, 15 U.S.C. § 77k, and prospectus under § 12(a)(2), 15 U.S.C. § 77$l$(a)(2) and controlling persons liability under § 15, 15 U.S.C. § 77o (counts one, two and three)

The underwriter defendants move to dismiss the plaintiffs' claims based on alle-

---

**1.** Additional plaintiffs, each of whom is a named plaintiff in one of the actions that comprises the consolidated action are Thomas J. Aubrey, Harris Blackman, Ralph Casey, Robert W. Conrad, Creciente Oceanica Armadora S.A., Jim A. Darby, Richard Eizenga, Steven Eline, Phil Hensley, Diane Hirschberg, Daryll Inman, Rebecca Inman, Leon Kramer, Macdil Enterprises, Inc., Simche Margolies, Julie Thorpe and Jayne Vaughn, Sandy Weinzweig, and Jacob Weiss.

**2.** The plaintiffs expressly exclude from counts one, two, and three all allegations of fraud.

gations that the secondary offering registration statement and prospectus contained untrue statements of material facts, omitted facts necessary to make the statements made not misleading, and failed to disclose material facts. The underwriter defendants argue that 1) the plaintiffs do not allege how or why the statements were false or misleading when made, 2) the forward-looking statements concerning management's plans for the future are expressly protected, and 3) generalized statements of optimism concerning opportunities and expectations are immaterial and not actionable as a matter of law under the safe harbor provision of the Reform Act.

The plaintiffs specify six statements in the prospectus and registration statement as false and misleading when made. Plaintiffs allege: 1) that the statement that, although the death rate was declining slightly, "the aging of the population ... represents ... a significant opportunity ... to expand [the] customer base" was misleading because the declining death rate was already affecting revenue and growth; 2) that "the Company's practice of clustering facilities and sharing services enabled it to decrease costs and expand marketing and sales" was misleading because the clustering practice resulted in increased competition with existing Company funeral homes; 3) that "combined operations resulted in lower average operating costs and expanded sales opportunities" was misleading because competition from wholesale and discount casket vendors who sold caskets at reduced prices cut the profitability of the operations; 4) that "extensive marketing of prearranged products produced a backlog of future business" was misleading because the backlog was the result of declining death rates; 5) "the strong emphasis on prear-

ranged sales distinguished the Company from its competition" was misleading because the sales of pre-need funeral services had slowed because of an increased trend toward cremation; and 6) "the Company expected to continue to increase its annual earnings per share at an annual rate of 20% each year" was misleading because the whole death care industry was experiencing a slowdown and the Company was suffering from the same adverse effects as its competitors.[3]

The prospectus, in describing the "death care industry," stated:

> Our management believes that the death care industry has several attractive fundamental characteristics. The industry is relatively stable, business failures are uncommon and the market served by death care providers is expanding. According to the United States Bureau of the Census, the number of deaths in the United States is expected to increase by approximately 1% per year from 2.38 million in 1998 to 2.64 million in 2010. In addition, industry studies indicate that while the death rate is declining slightly, the average age of the population in the United States is increasing. The aging of the population, particularly the "baby boomers" who have only recently begun to turn 50, represents a significant opportunity for firms such as our company to expand their customer base and secure a portion of their future market share by actively marketing prearranged property, merchandise and services. According to the Bureau of the Census, the United States population over 50 years of age will increase from 72.7 million in 1998 to 96.4 million in 2010. Our principal target market for sales of prearranged cemetery property, merchandise

---

**3.** "[T]he particularity requirement of Rule 9(b) does not apply to claims under § 11 of the Securities Act because proof of fraud or mistake is not a prerequisite to establishing liability under § 11." *In re NationsMart Corp. Securities Litig.*, 130 F.3d 309, 314 (8th Cir.1997). In *Melder v. Morris*, 27 F.3d 1097, 1100 n. 6 (5th Cir.1994), the Court of Appeals applied Rule 9(b)'s heightened pleading standard because all of the claims were grounded in fraud. The §§ 11 and 12(a)(2) claims do not allege that the defendants were liable for fraudulent conduct.

and services is customers who are age 50 and above.

Traditionally, death care businesses in the United States have been relatively small, family-owned enterprises that have passed through successive generations within the family. . . .

Our management believes it can be difficult for new competitors to successfully enter existing markets by opening new funeral homes and cemeteries.

The prospectus proceeds to explain the operations of the Company in various regards, including clustering, combined operations, and prearrangements:

*Clustering.* We operate most of our funeral homes and cemeteries in "clusters." Clusters are groups of funeral homes and cemeteries located close enough to each other that their operations can be integrated to achieve economies of scale. For example, clustered facilities can share vehicles, embalming services, inventories of caskets and other merchandise and, most significantly, personnel, including our prearrangement sales force; thus, we are able to decrease our costs and expand our marketing and sales efforts at each location. By virtue of their proximity to each other, clustered facilities also create opportunities for more integrated and sophisticated management of their operations.

. . . .

*Combined Funeral Home and Cemetery Operations.* A combined operation is a funeral home located on a cemetery site where both are operated together. Combined operations help to increase market share by allowing us to offer families the convenience of complete funeral home and cemetery planning and services from a single location at a competitive price at the time of need or on a prearranged basis. In addition, combined operations enhance our purchasing power, enable us to employ more sophisticated management systems, and allow us to share facilities, equipment, personnel and a prearrangement sales force, resulting in lower average operating costs and expanded marketing and sales opportunities.

Approximately 45% of our cemeteries have a funeral home on site that is operated in conjunction with that cemetery. Many of our combined operations are in key markets, including New Orleans, Louisiana; Dallas, Fort Worth and Houston, Texas; Miami, Orlando, Tampa and St. Petersburg, Florida; and San Diego, California.

In addition to pursuing combined operations as part of our acquisition strategy, we have developed several internal growth strategies that employ the use of combined operations. One such strategy is to create combined operations by constructing funeral homes on the grounds of our cemeteries, and we plan to construct approximately three funeral homes per fiscal year on our cemetery locations. Another such strategy is to enter into operating partnerships in which we construct funeral homes on the grounds of unaffiliated cemeteries, which allows us to enjoy the benefits of a combined operation without the capital investment of purchasing the cemetery.

Although it generally takes several years before a newly constructed funeral home becomes profitable, our experience with combined operations has demonstrated that the combination of a funeral home with a cemetery can significantly increase the market share and profitability of both.

. . . .

*Prearrangements.* We market death care products and services on a prearranged basis through a staff of approximately 3,500 commission sales counselors. Prearranged plans enable families to establish in advance and prepay for the type of service to be performed and the products to be used. The cost of such products and services is set at prices prevailing at the time the agreement is signed, rather than when the

products and services are delivered. Prearranged plans also permit families to eliminate the emotional strain of making death care decisions at the time of need.

We believe that extensive marketing prearranged products and services produces a backlog of future business and builds current and future market share. On average, over the past five years, we have sold nearly three prearranged funeral services for every one we have delivered from our backlog. During the fiscal year ended October 31, 1998, we sold approximately 66,500 prearranged funeral services, and as of October 31, 1998, we had a backlog of approximately 400,000 prearranged funeral services to be delivered in the future.

The prospectus explains the Company's plan for internal and external growth and distinguishes the strategy from that of its competitors. In general, the growth strategy is summarized as follows:

In pursuit of our ultimate goal of enhancing shareholder value, we plan to continue to increase our earnings per share at an annual rate of 20% each year through a balanced strategy of internal and external growth. Our internal growth strategy involves consistent improvement in both revenues and costs at existing and acquired operations, construction of new funeral homes and cemeteries, and innovative initiatives such as the use of operating partnerships and alternative service firms as described below. Our external growth strategy involves an aggressive, but disciplined, domestic and international acquisition program and the rapid and effective assimilation of the businesses we acquire.

In addition to the challenged statements concerning the strength of the death care industry, the operation of the funeral homes and cemeteries in clusters, the combined funeral home and cemetery operations, the marketing of prearranged products and services, and the goal of increasing earnings per share at an annual

rate of 20% each year, the prospectus concluded with a forward looking statement in the "Business" section:

Forward–Looking Statements

Certain statements made in this prospectus supplement and base prospectus that are not historical facts are intended to be forward-looking statements within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Our actual results could differ materially due to several important factors including the following:

Our ability to sustain recent levels of acquisition activity and enter new markets, including foreign markets

The economy, death rate and competition in our markets

Financial market conditions, including stock and bond prices and interest rates

Our ability to achieve economies of scale, manage growth and efficiently assimilate acquired operations

The performance of acquired businesses.

Such factors, and others, are more fully described in Item 5 of our Quarterly Report on Form 10–Q for the quarter ended July 31, 1998.

The prospectus refers the reader to its annual, quarterly, and special reports, proxy statements, and other information filed with the SEC, which the SEC permits to be incorporated by reference into the prospectus. The prospectus offers to provide a free copy of the relevant filings and, alternatively, provides the address, phone number, and internet address of the SEC to obtain such information. The following cautionary statement is also included: "You should rely only on information incorporated by reference or provided in this prospectus and any prospectus supplement. We have not authorized anyone else to provide you with different information."

■ Section 11 creates a private cause of action to address misstatements or material omissions contained in the registration statement, and § 12(a)(2) creates a private cause of action against those persons who offer or sell securities by means of misstatements or material omissions contained in a prospectus. *See Klein v. General Nutrition Companies, Inc.,* 186 F.3d 338, 342 (3rd Cir.1999). To establish a *prima facie* claim, the plaintiffs must allege that they bought the security based upon a misstatement or material omission. *In re NationsMart Corp. Securities Litig.,* 130 F.3d 309, 315 (8th Cir.1997). "Both § 77k and § 77(a)(2) require that an undisclosed fact be material at the time of offering in order for liability to attach." *Klein,* 186 F.3d at 342.

> Most often, whether liability is imposed depends on whether the predictive statement was "false" when it was made. The answer to this inquiry, however, does not turn on whether the prediction in fact proved to be wrong; instead falsity is determined by examining the nature of the prediction with the emphasis on whether the prediction suggested reliability, bespoke caution, was made in good faith, or had a sound factual or historical basis.

*Isquith v. Middle South Utils., Inc.,* 847 F.2d 186, 203–04 (5th Cir.1988).

■ Congress enacted the Reform Act[4] "to deter opportunistic private plaintiffs from filing abusive securities fraud claims, in part by raising the pleading standards for private securities fraud plaintiffs." *In re Silicon Graphics Inc. Securities Litigation,* 183 F.3d 970, 973 (9th Cir.1999). Under the PSLRA, a person shall not be liable with respect to any written forward looking statement to the extent that

(A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying

important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was—

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading. 15 U.S.C. § §§ 78u–5(c)(1)(A)–(B). A statement is forward looking if it is "a statement of future economic performance" or "any statement of the assumptions underlying or relating to [that] statement."

15 U.S.C. §§ 78u–5(I)(C)–(D). "An omitted fact is material if there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [act]." *Donald J. Trump Casino Securities Litig.,* 7 F.3d 357, 369 (3rd Cir. 1993).

■ "Materiality is traditionally a question for the trier of fact. However, if the alleged omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality, the court may rule them immaterial as a matter of law." *Klein,* 186 F.3d at 342 (internal quotation and citation omitted). "A determination of 'materiality' takes into account considerations as to the certainty of the information, its availability in the public domain, and the need for the information in light of cautionary statements being made." *Id.*

---

4. The Reform Act amends the Securities Exchange Act of 1934 and applies to private class actions. *In re Silicon Graphics Inc.*

*Securities Litigation,* 183 F.3d 970, 973 n. 2 (9th Cir.1999).

The court has considered the statements contained in the prospectus and the registration statement. In addition to Exhibit A, the court has studied the Company's Annual Report for fiscal year ending October 31, 1998, as reflected in Form 10–K filed with the Securities and Exchange Commission (SEC) on January 21, 1999; Forms 10–Q filed with the SEC; and the reports of the Wall Street analysts.

The representations in the prospectus are consistent with the independent opinion of Wall Street analysts Josephthal & Co. quoted by the plaintiffs in the amended complaint. Considering the comments made by Henican and Rowe in October 1998 after a September decline in the stock price, Josephthal gave the Company a "BUY" recommendation for the following reasons:

> Management confirms that **Wall Street's consensus estimate** (including Josephthal) of $0.94 this fiscal year (ending October 31) is solid, and it remains comfortable with the **consensus estimate** of $1.13 next fiscal year. Because the death care industry is highly recession-resistant and should not be affected by the Far East's problems, Stewart's earnings are more predictable than those of most companies. Furthermore, STEI's strong position in the cemetery business and in selling pre-need cemetery and funeral products and services gives the company an even stronger immunity to many potential problems.

Consistent with Josephthal's predictions, by October 15, 1998, the stock rebounded from $16 per share to $19 per share.

On December 15, 1998, the Company released the results for fiscal year 1998:

> Revenues **increased 22 percent** to 648.4 million from 532.6 million, earnings increased 32 percent to $92.2 million from $69.7 million, and diluted EPS [earnings per share] **increased 21 percent** to $.94 from $.78, before giving effect to the $50.3 million or $.51 per diluted share, after-tax, previously announced non-recurring, non-cash stock option charge

recorded during the second quarter of fiscal year 1998, and before the $2.3 million, or $0.3 per diluted share, after-tax, charge for cumulative effect of the change in accounting principles recorded in fiscal year 1997. Including the effect of the stock option charge, the Company reported earnings of $41.9 million, or $.43 per share, for the fiscal year.

(Emphasis added.)

The revenue and earnings results for fiscal year 1998 confirmed the Wall Street analysts' recommendation, and the Company's stock closed its fiscal year on October 21, 1998, at $21 15/16. On December 16, 1998, Joshua Rosen of ABN Amro issued a report on the Company reiterating the forecast of earnings per share of $1.13 for fiscal year 1999 and a three-to-five-year earnings growth rate of 20%. Rosen commented on ABN Amro's view of the improving acquisition environment and its impact on the death care industry:

> We still hold that the acquisition environment is improving, reiterating our statements after [Stewart Enterprises'] STEI's July quarter earnings announcement in September, "as a result of recent events amongst the publicly traded death care consolidators Equity Corporation (N.Y.SE: EQU—BUY rated) merging into Service Corporation (N.Y.SE: SRV—BUY rated) and The Loewen Group's (N.Y.SE: LWN—HOLD rated) (internal challenges), it is our belief that the domestic acquisition environment is likely to modestly improve over the course of the next twelve to eighteen months, benefitting STEI as well as SRV and Carriage Services (N.Y.SE: SCV—BUY rated)." We believe this improving environment contributed to the acquisition momentum experienced by STEI in the second half of FY98, and gives us conviction that FY99 should also be a strong year for acquisitions. Thus far in FY99 STEI has spent or committed to spend approximately $195 million on acquisition, put-

ting the company well on pace to meet or exceed our $230 million projection.

We are maintaining our FY99 estimate of $1.13. We remain comfortable with our 20 + % YTY growth projections in FY99 revenue, gross profit, operating income and EPS. STEI should benefit in FY99 both as its FY98 acquisitions begin to mature, as well as the improving acquisitions environment.

Analyst Lee Wilder of J.C. Bradford & Co. also issued a report on the Company on December 16, 1998. The report stated that

> STEI management expects acquisition valuations to decline over the next year but notes that premier properties will remain competitive bid situations.

On January 7, 1999, the Company's stock traded at $23 ¹¹⁄₁₆ per share, while, on January 26, 1999, Service Corporation, a competitor which enjoyed a BUY rating with ABN AMRO only weeks before, announced that their earnings for 1998 had been disappointing and that they would miss earnings estimates. Stewart Enterprises representatives expressed a belief to the market that they were not having the same problems as its competitors, Service Corporation and the Loewen Group. On January 29, 1999, the secondary offering price was $16.75 per share.

In support of this motion, the defendants introduced forms 10–Q for the periods ending January 31, 1999, and April 30, 1999. In addition, the court takes judicial notice of form 10–Q for the period ending July 31, 1998 (Exhibit B), which was referenced in the "forward-looking statement" of the prospectus. The forward-looking statements and the cautionary statements in Item 5 of the three 10–Q reports contain essentially the same information. The following cautionary statement, in relevant part, appears in form 10–Q for the period ending July 31, 1998:

### CAUTIONARY STATEMENTS

The Company cautions readers that the following important factors, among others, in some cases have affected, and in the future could affect, the Company's actual consolidated results and could cause the Company's actual consolidated results in the future to differ materially from the projections made in the forward-looking statements above and in any other forward-looking statements made by or on behalf of the Company.

(1) Achieving projected revenue growth depends upon sustaining the level of acquisition activity experienced by the Company in the last three fiscal years. Higher levels of acquisitions activity will increase anticipated revenues, and lower levels will decrease anticipated revenues....

(a) The Company may be unable to find a sufficient number of businesses for sale at prices the Company is willing to pay.

(b) In most of its existing markets and in many new markets, including foreign markets, that the Company desires to enter, the Company competes for acquisitions with the other publicly-traded death care firms. These competitors, and others, may be willing to pay higher prices for businesses than the Company or may cause the Company to pay more to acquire a business than the Company would otherwise have to pay in the absence of such competition....

(c) Achieving the Company's projected acquisition activity depends on the Company's ability to enter new markets, including foreign markets. Due in part to the Company's lack of experience operating in new areas and to the presence of competitors who have been in certain markets longer than the Company, such entry may be more difficult or expensive than anticipated by the Company.

(2) The level of revenues also is affected by the volume and prices of the properties, products and services sold.... The ability of the Company to achieve volume or price increases at any location depends on numerous factors,

including the local economy, the local death rate and competition.

(3) Another important component of revenue is earnings from the Company's trust funds and escrow accounts, which are determined by the size of, and returns (which include dividends, interest and realized capital gains) on the funds. . . .

(4) Future revenue also is affected by the level of prearranged sales in prior periods. The level of prearranged sales may be adversely affected by numerous factors, including deterioration in the economy, which causes individuals to have less discretionary income.

(5) The Company first entered foreign markets in the fourth quarter of fiscal year 1994, and no assurance can be given that the Company will continue to be successful in expanding in foreign markets, or that any expansion in foreign markets will yield results comparable to those realized through the Company's expansion in the United States.

(6) In addition to the factors discussed above, earnings per share may be affected by other important factors, including the following:

(a) The ability of the Company to achieve projected economies of scale in markets where it has "clusters" or combined facilities.

(b) Whether acquired businesses perform at pro forma levels used by management in the valuation process and whether, and the rate at which, management is able to increase the profitability of acquired businesses.

(c) The ability of the Company to manage its growth in terms of implementing internal controls and information gathering systems, and retaining or attracting key personnel, among other things.

(d) The amount and rate of growth in the Company's corporate general and administrative expenses.

(e) Changes in interest rates, which can increase or decrease the amount the Company pays on borrowings with variable rates of interest.

(f) The Company's debt-to-equity ratio, the number of shares of common stock outstanding and the portion of the Company's debt that has fixed or variable interest rates.

(g) The impact on the Company's financial statements of nonrecurring accounting charges that may result from the Company's ongoing evaluation of its business strategies, asset valuations and organizational structures.

(h) Changes in government regulation, including tax rates and structure.

(I) Changes in inflation and other general economic conditions both domestically and internationally, affecting financial markets (e.g. marketable security values as well as exchange rate fluctuations).

(j) Unanticipated outcomes of legal proceedings.

(k) Changes in accounting policies and practices adopted voluntarily or required to be adopted by generally accepted accounting principles.

(*l*) The ability of the Company and third parties to achieve Year 2000 compliance on a timely basis.

■ The court concludes that the statements in the prospectus and the incorporated form 10–Q are not actionable under the Reform Act because they are forward-looking statements, accompanied by meaningful cautionary statements, which are not misleading and do not contain material omissions. The plaintiffs' conclusory allegations that the declining death rate was already affecting revenue and growth are insufficient to allege that there were material omissions that would have been important to an investor. The death rate estimates are based on statistics provided by the United States Bureau of the Census and industry studies. The Company informed investors that, even though the

overall death rate was declining, the actual number of deaths would increase 1% per year for the next twelve years because of the number of aging "baby boomers" who were turning 50. The Company addresses the statistics in terms of a "significant opportunity ... to expand," and the forward-looking statement specifically identifies the death rate as a factor that could materially alter actual results. The statement identifies management's beliefs and assumptions underlying the future planning of the Company.

■ The statements concerning clustering, combined operations, and plans to market prearranged services, as well as statements distinguishing the Company from its competitors are not misleading because of the sound factual basis on which they rest. The earnings reports for fiscal year 1998 indicate that the Company's strategy was producing increased earnings. In late 1998, the Wall Street analysts recognized the problems in the industry, but continued to rate the major companies as a "BUY", except for the Loewen Group that maintained a "HOLD" rating. The industry as a whole was favored because it was not affected by market trends in the Far East. It was the consensus of the Wall Street analysts that Stewart's earnings were more predictable than those of most non-death-care-industry companies. Further, the forward looking statements of the prospectus and the SEC filings incorporated by reference recognize that the projections depend on the Company's ability to achieve economies of scale, manage growth, assimilate acquired operations, and operate acquired businesses profitably.

As to projected earnings for fiscal year 1999, financial reports subsequent to the preparation of the prospectus and the secondary offering support the statements made by Henican and Rowe and the positive expectations of the Wall Street analysts. On March 9, 1999, the Company reported its first quarter results for fiscal year 1999 (three months ending January 31st):

> [R]evenues for the first quarter of 1999 as compared to the first quarter of 1998 **increased 23 percent** to $182.9 million from $149.3 million, net earnings increased 21 percent to $26.5 million from $21.9 million, and diluted earnings per share increased 23 percent to $.27 from $.22.

(Emphasis added.) On June 9, 1999, the Company announced that

> revenues for the second quarter of 1999 [three months ending April 30th] as compared to the second quarter of 1998 **increased 31 percent** to $202.3 million from 154.6 million. Operating earnings increased 35 percent to $61.3 million from $45.4 million, net earnings increased 33 percent to $32.2 million from $24.3 million, and diluted earnings per share increased 16 percent to $.29 from $.25, exclusive of the $76.8 million ($50.3 million or $.51 per share, after tax) nonrecurring, non-cash stock option charge recorded in the second quarter of 1998 in connection with the vesting of the Company's performance-based stock options.

(Emphasis added.)

The court concludes that the defendants outlined in the prospectus the problems facing the industry and referred potential purchasers of the stock to consistent public documents filed with the SEC. The defendants presented their expectations and strategy for achieving their future goals and gave reasons for believing, at the time the statements were made, that their situation was different from competitors who were not able to adjust to the negative industry trends. The defendants identified their statements as forward looking and gave reasons for the assumption and why results could differ materially from projections. The predictive statements had a sound factual or historical basis and cautioned that "actual results could differ materially due to several important factors." Further, it was the consensus of

independent Wall Street analysts that the Company's projections were sound and that it was uniquely situated in the death care industry.[5] A reasonable investor received important facts from the prospectus concerning the death care industry and the negative trends in the industry that would aid in deciding how to act and was directed to the Company's filings with the SEC to obtain further detailed information.

Accordingly, the plaintiffs have failed to state a valid claim under 15 U.S.C. § 77k or § 77*l*. Because controlling person liability under § 77o hinges on liability under either § 77k or § 77*l*, the § 77o claims also fail. *See Klein,* 186 F.3d at 344. The motion to dismiss these claims is granted.

### C. Motion to dismiss 10(b) plaintiffs' securities fraud claims under §§ 10(b) and 20(a), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10(b)–5 (counts four and five)

#### 1) Heightened pleading requirement

The Company and the individual defendants contend that the 10(b) plaintiffs have failed to allege with particularity that a misstatement or omission of material fact was made with scienter or that the statements [6] were materially false or misleading at the time they were made. The Company and the individual defendants argue that the plaintiffs' claims are based on forward-looking statements which are not

actionable under the safe harbor created by the Reform Act. Further, they assert that, because there is no primary violation, there can be no claim under § 20(a).

Section 10(b) and Rule 10b–5 prohibit fraudulent activities in connection with securities transactions.[7] "The elements of fraud [under 10(b) and Rule 10b–5] include: 1) a misstatement or omission; 2) of material fact; 3) made with the intent to defraud; 4) on which the plaintiff relied; and 5) which proximately caused the plaintiff's injury." *Id.* Section 20(a) defines controlling person liability. 15 U.S.C. § 78t(a). If the plaintiffs fail to adequately plead a primary violation of § 10(b), the court dismisses the claim of secondary liability under § 20(a). *Shields v. Citytrust Bancorp., Inc.,* 25 F.3d 1124, 1132 (2d Cir.1994).

 The first sentence of Rule 9(b) of the Federal Rules of Civil Procedure imposes a heightened pleading standard for fraud claims: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir. 1994). Although Rule 9(b) applies to securities fraud, *see Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 177 (5th Cir. 1997), the PSLRA goes further than Rule 9(b) by heightening the standard for pleading scienter to require allegations support-

---

5. The plaintiffs do not allege that there was "entanglement" between a Company insider and the Wall Street analysts. *See Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 163 (2d Cir.1980). They merely allege that the analysts' reports were based on statements made by Henican and Rowe.

6. The 10(b) plaintiffs challenge essentially the same subject matter as the secondary offering plaintiffs: statements concerning negative industry trends, the aging of the population, the descriptions of financial strength, the Company' recession resistance, reasons for the lower cost of acquisitions, the backlog of prearranged sales of funeral services, the strategy to cluster and combine operations to decrease costs and expand marketing efforts, and earnings estimates and forecasts.

7. Section 10(b) makes it unlawful:

> To use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5 specifically prohibits the following:

> To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. . . .

ing a strong inference of scienter rather than a merely reasonable inference of scienter. *See Bryant v. Avado Brands, Inc.,* 100 F.Supp.2d 1368, 1374 (M.D.Ga. 2000) (dismissing the plaintiff's complaint after remand for failing to allege scienter with particularity) (citing *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 188 and 196 n. 9 (1st Cir.1999)).

"[A]rticulating the elements of fraud with particularity requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams,* 112 F.3d at 177 (agreeing with the Second Circuit's approach); 15 U.S.C. § 78u–4(b)(1). The failure to identify specific statements made by a defendant is fatal to the action because it deprives the defendants of notice. *Id.* at 179. "Where multiple defendants must respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Thornton v. Micrografx. Inc.,* 878 F.Supp. 931, 938 (N.D.Tex.1995) (citing *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987)). "Where pleading is permitted on information and belief, the complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990). If claims are based upon "an investigation of counsel," they are viewed as being based on information and belief if the sources do not provide the plaintiffs with personal knowledge. *See In re Silicon Graphics, Inc. Securities Litig.,* 970 F.Supp. 746, 763 (N.D.Cal.1997).

Additionally, the plaintiffs must allege facts to demonstrate that the defendants acted with scienter. *See McNamara v. Bre–X Minerals Ltd.,* 57 F.Supp.2d 396, 404 (E.D.Tex.1999). "Scienter is a mental state embracing intent to deceive, manipulate, or defraud." *Id.* The statute provides:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). However, the Reform Act "does not delineate what facts suffice to establish a 'strong inference' of fraudulent intent." The Fifth Circuit has not addressed this issue, and federal courts that have addressed the issue have reached different conclusions in interpreting the intent of Congress.[8]

The Ninth Circuit has held "that a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc. Securities Lit.,* 183 F.3d 970, 973 (9th Cir.1999). The holding reflects the court's conclusion "that Congress intended to elevate the pleading requirement above the Second Circuit standard requiring plaintiffs merely to provide facts showing simple recklessness or a motive to commit fraud and opportunity to do so." *Id.* The court stated that the "deliberate recklessness standard best serves the PSLRA's purpose." *Id.* at 975.

In *Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999) (quotations omitted), the Second Circuit stated that a plaintiff must either "(a) allege facts to show that defendants had both motive and opportunity to commit fraud or (b) allege facts that constitute strong circumstantial evidence of conscious misbehavior or reck-

---

8. *See* Symposium on Recent Circuit Court Decisions: Press, Silicon, Advanta and Comshare, 7 Securities Reform Act Litigation Reporter, 537–549 (Number 4 July 1999) (discussing the test for scienter under the heightened pleading standards).

lessness." The Second Circuit concludes "that the PSLRA effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher (with the exception of the 'with particularity' requirement)." *Novak v. Kasaks,* 216 F.3d 300, 2000 WL 796300 at *9 (2nd Cir. June 21, 2000). The Sixth Circuit has held that "plaintiff may survive a motion to dismiss by pleading facts that give rise to a strong inference of recklessness." *In re Comshare, Inc. Sec. Litig.,* 183 F.3d 542 (6th Cir.1999). The Third Circuit held that "it remains sufficient for plaintiffs plead [sic] scienter by alleging facts establishing a motive and an opportunity to commit fraud or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." *In re Advanta Corp. Securities Litig.,* 180 F.3d 525 (3d Cir.1999).

In *McNamara v. Bre–X Minerals Ltd.,* 57 F.Supp.2d at 411, the court agreed with the majority approach and "determined that scienter may be adequately plead by alleging facts constituting strong circumstantial evidence of conscious misbehavior or recklessness." The court agreed "with cases holding that motive facts can be considered in determining whether the complaint raises a strong inference of scienter, even though satisfaction of the motive test alone does not conclusively establish an inference of the required state of mind under the Reform Act." *Id.* The court reasoned as follows:

> Congress would not abolish the well established use of recklessness as permissible scienter under the securities laws without expressly stating so in the language of the statute. The Court also agrees with cases holding that satisfaction of the pre-Reform Act motive test does not automatically give rise to a strong inference that the defendant acted with the required state of mind [acknowledging in a footnote that the Second Circuit seemed to reach a different conclusion in *Press*]. However, this does not mean that in occasional cases

the inference drawn solely from motive and opportunity allegations will not be sufficiently strong to withstand a motion to dismiss, but merely that it will not always do so. Finally, even if the recklessness and motive tests are not satisfied, motive and recklessness facts should still be considered in determining if the totality of the allegations gives rise to a strong inference of the defendant's fraudulent intent.

*Id.* (internal quotations and citations omitted).

The court agrees with those decisions that conclude that, in addition to deliberate recklessness or conscious misconduct, although not sufficient in and of itself to establish a strong inference of fraudulent intent, motive and opportunity to commit fraud are factors that should be considered in determining whether the plaintiffs have established a strong inference of fraudulent intent. It is within this framework that the court proceeds with its analysis of the issues.

**2) Failure to plead scienter with particularity**

■ In the amended complaint, the plaintiffs made the following scienter allegations:

*Actual Knowledge and/or
Reckless Disregard*

134. As the top executives of Stewart Enterprises, Defendants Stewart, Henican, and Rowe ran Stewart Enterprises as "hands-on" managers. The Individual Defendants closely monitored the Company's performance via detailed reports that were generated on a daily, weekly and monthly basis. Stewart Enterprises' finance department also distributed monthly financial reports comparing actual financial results to projected results. Thus, the Individual Defendants knew where the Company stood in terms of the sale of and demand for its products as well as actual results compared to budget.

135. In addition, because of their top executive positions and intimate involvement in the day-to-day management of its business, the Individual Defendants actually knew, from internal corporate documents and conversations with other corporate officers and employees and their attendance at management and Board meetings, the adverse non-public information about Stewart Enterprises, including the adverse impact of declining death rates and price reductions, the problems with the Company expansion program and deteriorating revenue, gross profit margin and earnings prospects as pleaded herein. Thus, the Individual Defendants actually knew or recklessly disregarded that the public statements about the Company pleaded herein were false and misleading when made.

### Motive and Opportunity

136. Because of Stewart Enterprises' very rapid expansion program which entailed its acquiring large numbers of new funeral homes, Stewart was consuming large amounts of cash. In order to sustain the Company, its existing business model and the illusion of growth, defendants consistently needed to raise new equity capital by selling stock to the public. Subsequent to its initial public offering, Stewart had several secondary offerings to raise cash, as set forth below:

#### Public Offerings of Stock

| Date | Share | Price | Net Proceeds | Underwriters |
|---|---|---|---|---|
| 10/94 | 15,750,000 | $8.50 | $65.4M | Goldman Sachs & Co. Johnson Rice & Co. |
| 5/95 | 10,500,000 | $9.00 | $103.3M | Bear Stearns Goldman Sachs & Co. The Chicago Corp. Johnson Rice & Co. |
| 6/97 | 11,400,000 | $18.19 | $211M | Bear Stearns Goldman Sachs & Co. ABN AMRO Chicago Johnson Rice & Co. |

137. Stewart Enterprises' top insiders realized that it was imperative that they take action to maintain Stewart's stock price high enough so that they could pull off a secondary stock offering **before** the adverse impact the undisclosed negative factors discussed herein were having on Stewart's business could no longer be concealed and would have to be revealed—which would drive Stewart's stock price even lower. Such a large stock offering would be Stewart's last chance to raise the millions in additional capital which it knew it needed to buffer Stewart's business against the downturn that Stewart's top insiders knew was already underway.

138. Stewart insiders knew that certain negative conditions were having an adverse impact on Stewart's growth and profitability and that when these adverse conditions became publicly known, Stewart's stock price would decline sharply. In order to raise capital for Stewart on favorable terms **before** this negative information became public, defendants decided to undertake a large secondary offering of millions of share of Stewart stock. By selling share in this way, Stewart could maximize its stock sale proceeds because it could condition the market for the stock offering by issuing very positive statements and forecasts and push the stock up to higher levels, including making roadshow presentations before the Secondary Offering to disseminate favorable information to potential stock purchasers.

139. The key element of defendants' scheme was to push Stewart stock artificially higher so that the Secondary Offering would raise larger amounts of money for Stewart and the Stewart insider who sold shares in the offering, and so that the stock offering by Stewart would be non-dilutive, thus minimizing the adverse impact of the offering on Stewart's earnings per share power going forward. Thus, Stewart Enterprises and the Individual Defendants mounted a major campaign, disseminating extremely favorable, but false, information to the marketplace about Stewart, while

concealing the adverse conditions affecting Stewart's business.

140. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the materially false and misleading nature of the reports and statements described above, the 10(b) Plaintiffs and the other members of the 10(b) Class relied, to their damage, on the reports and statements described above and/or on the integrity of the market price of the Company's securities and the completeness and accuracy of the information disseminated to the Company's investors in connection with their purchase of the Company's securities. While defendants failed to reveal to the 10(b) Plaintiffs and the 10(b) Class information known to them about the Company's revenue problems, defendant F.B. Stewart availed himself of his inside knowledge by selling 747,-500 share of his Stewart Enterprises stock holdings at inflated prices.

141. At the time of said misrepresentations and omissions, the 10(b) Plaintiffs and the other members of the 10(b) Class were ignorant of their falsity, and believed them to be true. The 10(b) Plaintiffs and the other 10(b) Class members could not in the exercise of reasonable diligence have known the actual facts. In reliance on said misrepresentations and in reliance upon the superior knowledge and expertise of defendants, the 10(b) plaintiffs and the other members of the 10(b) Class were induced to, and did, purchase the Company's securities at artificially inflated prices. Had the 10(b) plaintiffs and the other members of the 10(b) Class known the truth, they would not have taken such action.

The defendants argue that the allegation that the individual defendants were "hands-on" managers who monitored performance through detailed reports is inadequate to plead particularized allegations of knowledge or reckless disregard. They argue that the allegation of motivation to maintain an artificially high stock price in order to complete the secondary offering successfully has been rejected by numerous courts as the basis for alleging knowledge or reckless disregard. The defendants argue that to allow that allegation to suffice would force every company and its officer to defend a securities fraud action any time there was a downturn in the stock's price following a public offering. Further, the defendants contend that the allegations of motive and opportunity to commit fraud fail to raise a strong inference of scienter. The Company and individual defendants argue that Stewart's sale of 747,500 shares in the secondary offering does not raise a strong inference of fraudulent intent because there is no particularized allegation that the size and the timing of the sale was suspicious. The defendants argue that Stewart sold less than 6.7% of his stock and continued to hold 93.3% of the Company's stock; he sold his shares at $16.75 per share, below the $24.75 price at which the shares traded just a few weeks earlier, and he had sold shares in five out of the Company's six public offerings.

The plaintiffs argue that they have alleged both actual knowledge and reckless disregard. They assert that the defendants admit that they had knowledge of the severe problems in the death care industry that the problems were affecting competitors and that they knowingly or recklessly made assurances that the Company was impervious to the negative industry trends. The plaintiffs refer to Henican's comments on January 26, 1999, denying that the Company was affected by problems plaguing its competitors (amended complaint, ¶ 56), statements by Henican and Rowe to analysts, following the March 9, 1999, press release on first quarter earnings, that the competitors' problems were positive for the Company (amended

complaint, ¶ 74), and Henican's interview with The Wall Street Transcript on April 5, 1999, in which he described the consolidation phase of the industry as a positive change and expressed that the Company expected to grow at the rate of 20% per year (amended complaint ¶ 83). The plaintiffs argue that the defendants ultimately revealed in the 10–K filed on January 27, 2000, after the class period, that the only difference between the Company and its competitors is that it chose to conceal and deny the effects of the negative trends in the industry.[9]

The plaintiffs assert that they have adequately alleged facts to support the alleged fraud based on the Company's desperate need to raise cash through the secondary offering to fund the aggressive expansion program and to mask the lack of cash flow from operations. The plaintiffs argue that, notwithstanding the small percentage of total holdings, the $12,000,000 sale was significant and represented 5% of the overall offering. The plaintiffs speculate that "Stewart likely knew that if he were to sell a larger portion of his holdings, the price of Stewart stock would plummet" and that "[i]f F.B. Stewart could have sold his shares at a high price, he would have."

The court concludes that the plaintiffs have not alleged particularized facts to support the allegations that the defendants knew or recklessly disregarded signs that the problems affecting the industry in general were contemporaneously affecting the Company. Plaintiffs are not allowed to proceed with allegations of "fraud by hindsight." *Novak v. Kasaks*, 2000 WL 796300 at *8 (2nd Cir.2000). "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain

disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Id.* If the plaintiffs contend that the defendants had contrary information, they must identify the reports that contained the information. *Id.*

The statements referred to by the plaintiffs as the source of information do not support their allegations of knowledge and recklessness which constitute a strong inference of an intent to defraud. The financial reports for fiscal 1998 and the first two quarters of 1999 indicate an increase in the Company's revenues. Moreover, the defendants disclosed that they would maintain their opportunistic approach to acquisitions and revealed the concerns in the marketplace through a disclaimer in news releases on March 9, 1999 and June 9, 1999, prior to the August 12, 1999, news release:

> Statements made herein that are not historical facts are forward-looking statements. The Company's actual results could differ materially due to several important factors including the following: the Company's ability to sustain recent levels of acquisition activity and enter new markets; the economy, death rate and competition in the Company's markets; financial market conditions, including stock and bond prices and interest rates; the Company's ability to achieve economies of scale and manage growth; and the performance of acquired businesses.

The March 9 press release refers the reader to forward-looking statements and cautionary statements in Item 7 of the Company's form 10–K for the fiscal year ended October 31, 1998, and the June 9 press release refers the reader to the forward-looking statements and cautionary statements in Item 5 of the Company's form

---

**9.** The plaintiffs ask the court to take judicial notice of the 1999 10–K filed with the SEC on January 27, 2000, in which the defendants admit that the Company's operations were adversely affected in 1999 by "(1) intense and growing price competition from low-cost fu-

neral providers and casket stores in some markets, (2) the continuing and accelerating trend toward cremation, and (3) a shift by consumers to lower-priced services and merchandise."

10–Q for the quarter ended January 31, 1999. The defendants' statements containing simple economic projections, statements of optimism, and other puffery are insufficient to support a strong inference of an intent to defraud. *See Novak,* 2000 WL 796300 at *15.

Further, the court concludes that the particular facts pleaded by the plaintiffs concerning motive and opportunity, coupled with allegations of deliberate recklessness or conscious misconduct, do not give rise to a strong inference of fraudulent intent. "[A]ssertions that would almost universally be true, such as the desire to raise capital, or successfully to bring a public offering to fruition, economic self-interest, and the desire to ... protect one's executive position are inadequate of themselves to plead motive." *Coates v. Heartland Wireless Communications, Inc.,* 55 F.Supp.2d 628, 644 (N.D.Tex.1999) (internal citations omitted). Further, Stewart's trading activity is not so unusual as to permit an inference of scienter, and the fact that other officers did not sell shares during the relevant period undermines the plaintiffs' motive theory. *Id.* at 920.

### 3) Alleged "Misleading Statements" are not actionable

The defendants do not dispute that the plaintiffs have identified what statements are contended to be fraudulent, who made the statements, and when and where the statements were made. However, the defendants argue that the statements fail to state a claim upon which relief can be granted because the identified statements are not actionable. The defendants argue that, because the statements alleged are not actionable as a matter of law, the court need not permit the plaintiffs an opportunity to amend the complaint to replead the allegations concerning those statements.

"[M]isguided optimism is not a cause of action and does not support an inference of fraud." *Shields v. Citytrust Bancorp., Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994). "Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1119 (10th Cir.1997). Investors "rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen." *Raab v. General Physics Corp.,* 4 F.3d 286, 290 (4th Cir.1993).

For essentially the same reasons stated in the analysis of the secondary offering plaintiffs' allegations under §§ 11, 12(a)(2), and 15, the statements made by the Company upon which the 10(b) plaintiffs rely to support their claim are protected under the safe harbor provisions of the Reform Act. Accordingly, the plaintiffs have not adequately alleged facts in support of their claims that would entitle them to relief.

Because the plaintiffs have not adequately alleged a primary violation, the § 20(a) [10] claims for controlling person liability are also dismissed. *See Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1021 n. 8 (5th Cir.1996) ("Because the Plaintiffs have failed to state a claim for any predicate securities fraud offense under § 10(b), Plaintiffs have necessarily failed to state a claim against [the defendants] for 'controlling person' liability under § 20(a).").[11]

### IV. CONCLUSION

Accordingly, viewing the complaint in favor of the plaintiffs and taking all of the

---

**10.** Section 78t(a) provides for liability of controlling persons:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to

whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

**11.** The plaintiffs do not seek an opportunity to amend the complaint.

facts pleaded in the complaint as true, the court concludes that the plaintiffs can prove no set of facts which would entitle them to relief. The motion to dismiss the secondary offering plaintiffs' claims relating to a false registration statement and prospectus is hereby granted, and the motion to dismiss the 10(b) plaintiffs' securities fraud claims is hereby granted.