**In re BAKER HUGHES SECURITIES LITIGATION**

No. CIV.A. H–99–4281.

United States District Court, S.D. Texas, Houston Division.

March 30, 2001.

Daniel J. Petroski, Jr., Vahldiek, Cano, Grayson, Hovenkamp & Petroski; Jeffrey M. Haber, Timothy J. MacFall, Joseph R. Seidman, Jr., Bernstein Liebhard & Lifshitz, LLP; Vincent R. Cappucci, Robert N. Cappucci, Entwistle & Cappucci LLP; Stephen J. Fearon, Jr.; Nancy Kaboolian, Abbey, Gardy & Squitieri, LLP, Houston, TX, on brief, for plaintiffs.

David D. Sterling, Michael P. Graham, Ronald C. Lewis, Samuel Cooper, Baker Botts L.L.P., Houston, TX, on briefs, for defendants.

## ORDER

GILMORE, District Judge.

Pending before the Court is the Defendants' motion to dismiss the Plaintiffs' consolidated amended class action complaint. (**Instrument No. 53**). Having considered the parties' submissions and the applicable law, the Court finds that the motion is **GRANTED**.

### I.

Lead Plaintiffs YMCA Retirement Fund, Howard University, Federated National Insurance Company, Headwaters Capital L.L.C., and Frank D. Timmons (collectively, "Plaintiffs") bring this action against Defendants Baker Hughes, Inc. ("Baker"), Max Lukens ("Lukens"), and George S. Finley ("Finley") (collectively, "Defendants") alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b–5, as promulgated by the Securities and Exchange Commission ("SEC"). (Instrument No. 48, at ¶¶ 83–91).

In a motion to dismiss, the Court accepts as true all allegations contained in the Plaintiffs' complaint. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir.1982). The Plaintiffs allege the following facts. Baker, a Delaware corporation, was formed in 1987 as a result of the combination of Baker Hughes International Corporation and the Hughes Tool Company. (Instrument No. 48, at ¶ 27). Defendant Lukens served as Baker's president, chief executive officer, and chairman of the board until his termination on approximately January 31, 2000. (*Id.* at ¶ 12(a)). Defendant Finley has served as Baker's senior vice president and chief financial officer since May 21, 1999, and previously held the position of chief administrative officer. (*Id.* at

¶ 12(b)). Baker supplies reservoir-centered products, services, and systems to oil and gas companies across the world. (*Id.*). It is composed of nine divisions which report to two primary groups: Baker Hughes Oilfield Operations; and Baker Process. (*Id.*). Baker's Oilfield Operations consist of eight divisions, one of which is the INTEQ discovery division. (*Id.*).

As a result of a decline in demand for Baker products and services, Baker sought to improve its operating margins through the purchase of Western Atlas Inc. ("Western"), which was announced on May 10, 1998. (*Id.* at ¶¶ 28–29). The acquisition of Western was well-received by securities analysts; Baker stock traded between approximately $31 and $36 from May 10, 1998, until August 10, 1998. (*Id.* at ¶¶ 30–32). Following the completion of the Western merger on August 10, 1998, Baker announced in a November 2, 1998, press release that it earned $1.6 billion in gross revenue and $65 million in net income for the third quarter ending on September 30, 1998. (*Id.* at ¶ 34). Additionally, on November 2, 1998, the Robinson–Humphrey Co. issued a report pertaining to Baker's third quarter results and noted that it was impressed with Baker's aggressive response to the "current market environment." (*Id.* at ¶ 37). The report stated that Baker was, among other things, "accelerating [its] [Project] Renaissance restructuring program," which was estimated to result in a total savings of approximately $130 million. (*Id.*). Baker's reported third quarter results were filed with the SEC in a Form 10–Q on November 16, 1998. (*Id.* at ¶ 36).

In its 1998 annual report distributed to shareholders, Baker represented that "management maintains and relies on [Baker's] system of internal control...The system is designed to provide reasonable assurance that assets are safeguarded,

transactions are executed in accordance with management's authorization and accounting records are reliable." (*Id.* at ¶ 40). One of the methods of cutting costs and streamlining internal controls was Project Renaissance ("Project"), which was introduced in 1998. (*Id.* at ¶ 41). The Project was built around a company-wide information system created to unify all accounting and data management systems. (*Id.*).

On February 1, 1999, Baker announced its results for the fourth quarter ending December 31, 1998. (*Id.* at ¶ 38). Baker reported that it earned $1.4 billion in gross revenues and $45 million in net income. (*Id.*). In its March 17, 1999, Form 10–K filing with the SEC, Baker disclosed the fourth quarter figures announced in February 1999, and stated that year-end retained earnings were $66.1 million. (*Id.* at ¶ 39). For the first quarter ending on March 31, 1999, Baker announced on May 3, 1999, gross revenues of $1.3 billion and net income of $42.7 million. (*Id.* at ¶ 43). On May 3, 1999, Baker stock closed at $31 $15/16 per share. (*Id.* at ¶ 44). Baker's May 14, 1999, Form 10–Q filed with the SEC reported the figures cited on May 3, 1999. (*Id.* at ¶ 46).

On May 21, 1999, Baker announced the resignations of Eric Mattson, its senior vice president and chief financial officer, and James Harris, its controller. (*Id.* at ¶ 47). Finley was elevated to the position of senior vice president and chief financial officer. (*Id.*). Following the personnel change, Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") issued a report on May 21, 1999, stating that it was assured by Baker contacts that "there are no accounting issues and the strong share price performance indicates acceptance of this by investors." (*Id.* at ¶ 48). By the end of the market day, Baker stock increased to $31.125 per share. (*Id.* at ¶ 49).

A similarly positive report from Schroder & Co. on June 17, 1999, preceded a stock rise that day to $34%₆ per share. (*Id.* at ¶¶ 50–51). In August 1999, Lukens stated that Baker "expect[ed] revenue and profits to...improve over the next six months." (*Id.* at ¶ 54). By August 25, 1999, Baker was considered a "strong buy" by analysts. (*Id.* at ¶ 57).

On September 27, 1999, Baker filed a Form S–3 "shelf registration" with the SEC for the future issuance of debt and equity securities totaling one billion dollars. (*Id.* at ¶¶ 3, 58). The Plaintiffs claim that it was critical for Baker to raise capital because the Form S–3 allegedly disclosed that Baker earnings were inadequate to cover fixed charges by over $500 million. (*Id.*). On November 1, 1999, Baker released its interim third quarter results for the period ending September 30, 1999. (*Id.* at ¶ 59). Baker reported gross revenues of $1.2 billion and net income of $13.1 million. (*Id.*).

On December 1, 1999, Baker announced that, as a result of market conditions in its seismic and processing businesses, operating results for the quarter ending December 31, 1999, would reflect a $130 million pre-tax charge in order to dispose of assets and equipment. (*Id.* at ¶ 61). Approximately one week later, on December 8, 1999, Baker announced that its internal audit department discovered accounting issues in the INTEQ division. (*Id.* at ¶ 62). It estimated that the accounting issues could result in a "cumulative pretax negative effect ... of $40 million to $50 million, including the possible restatement of prior period results." (*Id.*). Baker additionally announced that it was postponing a $200 million note offering "intended to refinance current maturities of debt and finance the purchase of a seismic vessel." (*Id.*). The Plaintiffs claim that the debt refinancing was cancelled because "had [Baker] attempted to proceed with the offering, the

interest rate payable to debt holders would have been at junk bond levels." (*Id.* at ¶ 73). On December 9, 1999, following the announcement, the value of Baker stock dropped to $19.25 from $22.50 per share. (*Id.* at ¶ 63).

Baker announced the resignation of INTEQ's president, Tim Probert, on December 16, 1999. (*Id.* at ¶ 64). Over a month later, on January 24, 2000, Baker General Counsel Lawrence O'Donnell resigned for unspecified reasons. (*Id.*). The resignations were followed on January 31, 2000, by the termination of Lukens from his positions as chairman of the board and chief executive officer. (*Id.*). Additionally, Thomas R. Bates, Jr., resigned as head of Baker Western Geophysical, Baker Atlas, and INTEQ. (*Id.*).

On February 17, 2000, Baker reported that, as a result of the previously announced accounting issues, it would restate financial results by reducing retained earnings in the amount of $31 million; $24.2 million related to INTEQ's operations in Venezuela. (*Id.* at ¶ 66). The Plaintiffs allege that, for the quarter ending December 31, 1999, Baker had a deficit of $51.5 million, versus 1998 retained earnings in the amount of $66.1 million. Furthermore, by the end of December 1999, according to the Plaintiffs, Baker had a cash account of only $16.1 million. (*Id.* at ¶ 72).

Plaintiff David Abrams, on behalf of himself and all other similarly situated stockholders, filed suit against the Defendants and Director Andrew Szescila on December 9, 1999. (Instrument No. 1). The Court signed an Order on February 8, 2000, consolidating Abrams' suit and 21 other actions under the caption *In re Baker Hughes Securities Litigation.* (Instrument No. 18). Additionally, the Court ruled that "all subsequently filed actions raising the same or similar issues against all or some of the Defendants shall be

automatically consolidated." (*Id.* at 8). On March 6, 2000, the Court ordered the appointment of Lead Plaintiffs and approved the selection of their counsel. (Instrument No. 27). Subsequently, on June 23, 2000, the Lead Plaintiffs filed their consolidated amended class action complaint. (Instrument No. 48). The amended complaint names Baker, Lukens, and Finley as Defendants. (*Id.* at 4–5).

On August 4, 2000, the Defendants filed a motion to dismiss the Plaintiffs' consolidated amended complaint for failure to state a claim upon which relief can be granted. (Instrument No. 53). The Defendants urge the Court to dismiss the complaint because the Plaintiffs have failed to adequately plead the requirements for securities fraud. Specifically, they contend that the Plaintiffs have not alleged particularized facts as to the Defendants' scienter, nor have they shown that the alleged misleading public statements are material. (*Id.* at 13–30).

As to scienter, the Defendants first assert that there are insufficient facts pertaining to the Defendants' motive and opportunity to commit fraud. (*Id.* at 13). For example, there are no particularized facts, according to the Defendants, demonstrating that the accounting issues were motivated by the Defendants' desire to raise working capital for Baker. (*Id.* at 14–17). Similarly, the Defendants argue that the facts do not support the Plaintiffs' claim that Lukens and Finley, as senior Baker officers, were motivated to conceal Baker's internal control problems in order to receive incentive compensation. (*Id.* at 18). Further, the Defendants maintain that there are no pleaded facts that the Defendants were aware of any internal control lapses prior to the December 8, 1999, announcement. (*Id.* at 19). The Defendants additionally argue that motive and opportunity to commit fraud has not been adequately pleaded because Finley's

Baker stock sales were not unusual or otherwise suspicious. (*Id.* at 20). Moreover, Lukens did not sell any of his personal shares in Baker during the class period. (*Id.* at 21).

The Defendants also argue that the required strong inference of scienter has not been raised because the Plaintiffs' facts do not constitute conscious misbehavior or severe recklessness. (*Id.* at 22). There are no particularized facts that Lukens or Finley had actual knowledge of the INTEQ accounting issues; they complain that the Plaintiffs simply plead fraud by hindsight. (*Id.* at 24–27). Finally, the Defendants assert that scienter has not been sufficiently pleaded because the Plaintiffs only allege generalized violations of generally accepted accounting principles, or GAAP. (*Id.* at 27). To the Defendants, the Plaintiffs do no more than cast purported GAAP violations as *ipso facto* proof of intentional fraud. (*Id.* at 28).

In addition to the scienter element, the Defendants seek dismissal of the complaint because the Plaintiffs have failed to allege a misrepresentation of a material fact. (*Id.* at 29). According to the Defendants, Baker's restatement of $31 million over a five-year period is not material as a matter of law. (*Id.*). That is, the amount in question is too small to have had any impact on Baker's operations. (*Id.*).

On September 6, 2000, the Plaintiffs' filed a response to the Defendants' motion to dismiss. (Instrument No. 58). They first argue that a strong inference of scienter has been raised based on the Defendants' motive and opportunity. (*Id.* at 15). For instance, the Defendants allegedly concealed the accounting issues in order for the debt offering to succeed because, without that scheduled offering, Baker would have been forced to utilize its credit facility at a great expense. (*Id.* at 17–18). In addition, the Plaintiffs assert that they

have pleaded sufficient facts of motive and opportunity to commit fraud because Lukens and Finley would only have received incentive compensation "if the [Project Renaissance] accounting program appeared to be successful." (*Id.* at 22). Finally, the Plaintiffs argue that a third motive and opportunity has been adequately pleaded because Finley sold over 21,000 of his personal shares in Baker on May 5, 1999. (*Id.* at 24). According to the Plaintiffs, Finley sold his stock based on material, non-public information concerning Baker's internal control problems. (*Id.*).

As to their allegation of conscious misbehavior or recklessness, the Plaintiffs respond that a strong inference of scienter has been raised because Lukens and Finley were senior officers with access to updated information about Baker's internal control problems. (*Id.* at 27–28). Additionally, the Plaintiffs argue that a strong inference of scienter has been raised because of the Defendants' GAAP violations. (*Id.* at 30). They contend that the Defendants' material overstatement of Baker's retained earnings in excess of $31 million, and their failure to maintain adequate internal controls are GAAP violations which support a finding of scienter. (*Id.* at 32).

Finally, as to the Defendants' argument that the Plaintiffs have not alleged a material misrepresentation, the Plaintiffs assert that materiality should not be evaluated solely by reference to the amount of money Baker restated as earnings. (*Id.* at 34). Rather, materiality must be assessed, according to the Plaintiffs, by factoring Baker's cancelled debt offering and its loss of credibility. (*Id.*). The Plaintiffs respond that the Defendants' misrepresentations caused effects far greater than the $31 million that Baker was forced to restate. (*Id.* at 38).

On September 25, 2000, the Defendants filed a reply to the Plaintiffs' response.

(Instrument No. 64). The Defendants contend that there are no particularized facts as to the Defendants' motive and opportunity. (*Id.* at 7). There are allegedly no facts that Lukens or Finley would have personally profited from any capital raising for Baker, nor is there any specificity pertaining to the incentive compensation claim. (*Id.* at 7–11). Likewise, the Defendants dispute the Plaintiffs' characterization of Finley's stock sales as suspicious or unusual because Finley's sales occurred seven months prior to the announcement of the accounting issues and he retained a majority of his personal Baker securities. (*Id.* at 13). The Defendants also reply that there are insufficient facts of conscious misbehavior because the Plaintiffs' allegations do not raise an inference that the Defendants were aware of the accounting issues before they were publicly disclosed. (*Id.* at 14). Similarly, the Defendants argue that the Plaintiffs' GAAP allegations only focus on retained earnings, while ignoring other reported financial figures such as net income. (*Id.* at 17).

## II.

Federal Rule of Civil Procedure 12(b)(6) allows for dismissal if a plaintiff fails "to state a claim upon which relief may be granted." Such dismissals, however, are rare, *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir.1986), and only granted where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Dismissal can be based either on a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1988); *Vines v. City of Dallas, Texas*, 851 F.Supp.

254, 259 (N.D.Tex.1994), *aff'd,* 52 F.3d 1067 (5th Cir.1995).

In determining whether a dismissal is warranted pursuant to Rule 12(b)(6), the Court accepts as true all allegations contained in the plaintiff's complaint. *Gargiul v. Tompkins,* 704 F.2d 661, 663 (2d Cir. 1983), *vacated on other grounds,* 465 U.S. 1016, 104 S.Ct. 1263, 79 L.Ed.2d 670 (1984); *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982). All reasonable inferences are to be drawn in favor of the plaintiff's claims. *Id.* "To qualify for dismissal under Rule 12(b)(6), a complaint must on its face show a bar to relief." *Clark,* 794 F.2d at 970.

## III.

In their motion, the Defendants move to dismiss the Plaintiffs' consolidated amended complaint as to the allegations under section 10(b) and Rule 10b–5. (Instrument No. 53, at 6–30). Although the Defendants do not specifically seek dismissal of the Plaintiffs' claim under section 20(a), that claim must also be dismissed should the Court dismiss the section 10(b) and Rule 10b–5 claims. *See Mortensen v. Ameri-Credit Corp.,* 123 F.Supp.2d 1018, 1028 (N.D.Tex.2000) (*"Mortensen II"*) (dismissing section 20(a) claim for controlling person liability where underlying securities law claims were also dismissed).

Under section 10(b) of the Securities Exchange Act of 1934, it is unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Similarly, the SEC has promulgated Rule 10b–5, which makes it unlawful for any person, directly or indirectly, "[t]o make any un-

true statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

Accordingly, in order to state a claim for fraud under section 10(b) and Rule 10b–5, a plaintiff must establish: (1) a misstatement or omission; (2) of a material fact; (3) made with the intent to defraud; (4) on which the plaintiff relied; and (5) which proximately caused the plaintiff's injury. *Williams v. WMX Techs., Inc.,* 112 F.3d 175, 177 (5th Cir.1997). In a claim for fraud, all allegations about the circumstances constituting fraud must be stated with particularity. Fed.R.Civ.P. 9(b). Pleading with particularity requires the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Williams,* 112 F.3d at 177 (quoting *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir.1994)). The requirements of Federal Rule of Civil Procedure 9(b) provide a defendant with fair notice of a plaintiff's claims, protect him from harm to his reputation and goodwill, reduce the number of strike suits, and prevent a plaintiff from filing baseless claims and then attempting to discover unknown wrongs. *Melder v. Morris,* 27 F.3d 1097, 1100 (5th Cir.1994).

The pleading requirements of Rule 9(b) as applied to securities fraud claims were reinforced in 1995 with the passage of the Private Securities Litigation Reform Act ("PSLRA"). The PSLRA sets the required pleading standard in private securities actions: "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allega-

tion regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

In this motion, the Defendants challenge the adequacy of the Plaintiffs' complaint on two grounds. First, the Defendants contend that the complaint fails to plead with particularity their intent to defraud, or scienter. Second, the Defendants argue that the Plaintiffs have to failed to allege with particularity a misrepresentation of a material fact. (Instrument No. 53, at 13–30).

## A.

■ The Defendants claim that the complaint fails to adequately allege the Defendants' scienter. Scienter is understood to be "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976); *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996). Prior to the enactment of the PSLRA, pleading scienter could be averred generally under Rule 9(b). *Tuchman,* 14 F.3d at 1068. However, the pre-PSLRA standard required "more than a simple allegation that a defendant had fraudulent intent." *Id.* A plaintiff was required to "set forth specific facts that support an inference of fraud." *Id.*

Before the enactment of the PSLRA, an inference of fraudulent intent could be established under the Second Circuit's "strong inference" standard. *In re Paracelsus Corp. Sec. Litig.,* 61 F.Supp.2d 591, 595 (S.D.Tex.1998) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)). Under this standard, a "strong inference" could be raised by alleging facts to show that the defendant had the "motive and opportunity" to commit fraud, or by setting forth facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* The Fifth Circuit adopted this approach as applied to section 10(b) claims. *Tuchman,* 14 F.3d at 1068.

The PSLRA, enacted shortly after the Second Circuit's decision in *Shields,* codified the pleading standard for scienter in a private securities action. It requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). A failure to plead the necessary particular facts warrants the dismissal of the plaintiff's action. 15 U.S.C. § 78u–4(b)(3)(A).

Despite the clarity of the Congress' language that a complaint must state particularized facts giving rise to a "strong inference" that the defendant acted with scienter, the federal courts have laboriously debated the test for determining when a "strong inference" has been established. *See, e.g., Greebel v. FTP Software, Inc.,* 194 F.3d 185, 199 (1st Cir. 1999). The Fifth Circuit has yet to rule on this important pleading issue.[1] *Eizenga v. Stewart Enters., Inc.,* 124 F.Supp.2d 967, 981 (E.D.La. Dec.6, 2000). Within this Circuit, the district courts have devel-

---

1. The Plaintiffs contend that in *Williams v. WMX Techs., Inc.,* 112 F.3d 175 (5th Cir. 1997), the Fifth Circuit adopted the Second Circuit's "strong inference" approach to pleading securities fraud. (Instrument No. 58, at 14 n. 6). However, in *Williams,* the court dealt exclusively with the issue of whether the plaintiffs' complaint satisfied the particularity requirements of Rule 9(b). 112 F.3d at 177–78. Accordingly, the Court finds persuasive the analysis in *Paracelsus,* 61 F.Supp.2d at 598 n. 2, in which a court of this District concluded that the *Williams* case did not interpret the PSLRA's scienter requirement in a section 10(b) claim.

oped conflicting interpretations of the PSLRA's pleading requirements. *Compare Coates v. Heartland Wireless Communications, Inc.*, 100 F.Supp.2d 417, 422 (N.D.Tex.2000) ("*Coates III*") (holding that a strong inference of scienter can be raised either by alleging facts based on motive and opportunity, or facts constituting strong circumstantial evidence of conscious behavior or severe recklessness), *and Mortensen II*, 123 F.Supp.2d at 1023 (same), *with Paracelsus*, 61 F.Supp.2d at 598 (holding that the PSLRA eliminates the ability to plead scienter solely by alleging facts of motive and opportunity), *and with Eizenga*, 124 F.Supp.2d at 982 (holding that motive and opportunity to commit fraud is a relevant factor in establishing a strong inference of scienter, although "not sufficient in and of itself"), *and McNamara v. Bre–X Minerals Ltd.*, 57 F.Supp.2d 396, 411 (E.D.Tex.1999) (same).

Several courts have ruled that the PSLRA eviscerated the previous pleading standard announced by the Second Circuit that a plaintiff may raise a strong inference of scienter by showing a defendant's "motive and opportunity" to commit fraud, or by setting forth facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 979 (9th Cir.1999); *see also Paracelsus*, 61 F.Supp.2d at 600 (holding that "Congress has rendered allegations of [motive and opportunity] to be inadequate to give rise to a strong inference of scienter").

In *Silicon Graphics*, the Ninth Circuit delved extensively into the legislative history of the PSLRA and concluded that the Congress adopted a standard more stringent than that of the Second Circuit. 183 F.3d at 979. The court noted that the Congress declined to enact an amendment which would have codified the Second Cir-

cuit's two-pronged test. *Id.* at 978. It found compelling that the Congress overrode President Clinton's veto, despite the President's concern that, in his words, "the pleading requirements of the Conference Report with regard to a defendant's state of mind imposes an unacceptable procedural hurdle to meritorious claims being heard in Federal courts." *Id.* at 979 (quoting 141 Cong. Rec. H15,214 (daily ed. Dec. 10, 1995)). According to the Ninth Circuit, the override "provided powerful evidence of [the Congress'] intent to elevate the pleading standard to a level beyond that in the Second Circuit." *Id.*

The court in *Silicon Graphics* held that the PSLRA requires that a plaintiff "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Id.* at 974. Although facts showing mere recklessness or a motive and opportunity to commit fraud can provide some reasonable inference of scienter, the court determined that "they are not sufficient to establish a strong inference of deliberate recklessness." *Id.* The Ninth Circuit's "deliberate recklessness" standard demands "specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Id.* at 979.

In contrast, numerous federal courts, including several in this Circuit, have held that the PSLRA did not raise the pleading standard for establishing a strong inference of scienter any higher than that previously existing in the Second Circuit. *See Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir.2000), *cert. denied*, —— U.S. ——, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir.1999) (holding that it remains sufficient for a plaintiff to plead motive and opportunity, or reckless or conscious behavior); *see also Coates v. Heartland Wireless Communications, Inc.*, 55

F.Supp.2d 628, 642 (N.D.Tex.1999) ("*Coates II* ") (holding, in accordance with the Second Circuit, that scienter can be pleaded based on motive and opportunity to commit fraud). The view of these courts, most notably articulated by the court in *Novak*, is that the Congress plainly sought to impose a strict nationwide pleading standard consistent with the Second Circuit's previous standard. 216 F.3d at 310. Additionally, the *Novak* court found the legislative history conflicting. Whereas the Conference Committee rejected the Senate bill's language about motive and opportunity and recklessness, the Senate Committee reporting the bill stated that it was proposing a uniform standard modeled upon the Second Circuit's pleading standard. *Id.* at 311 (quoting S.Rep. No. 104–98, at 15 (1995)). Except for the addition of the words "with particularity," *Novak* held that the PSLRA did not change the pre-existing pleading standard for scienter. *Id.*

In yet a third line of reasoning, some federal courts have adopted an intermediate standard. Although they reject the *Silicon Graphics* court's actual knowledge requirement, these courts conclude that a strong inference of scienter is established by alleging specific facts constituting strong circumstantial evidence of recklessness or conscious misbehavior. *See In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 551 (6th Cir.1999) (holding that a plaintiff "may meet [the] PSLRA pleading requirements by alleging facts that give rise to a strong inference of reckless behavior"); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1283 (11th Cir.1999) (holding that the Congress would have explicitly required actual knowledge, rather than recklessness, had that been its intent); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 201 (1st Cir.1999) (same); *see also McNamara*, 57 F.Supp.2d at 411 (same); *Eizenga*, 124 F.Supp.2d at 982 (same). The PSLRA's language pertaining to a defendant's "re-quired state of mind" had been, at the time the statute was drafted, "clearly defined by the federal courts to encompass reckless behavior." *Bryant*, 187 F.3d at 1284. Consequently, by failing to adopt an alternative standard, these courts hold that recklessness was not eliminated as a means of pleading scienter. *Id.*

In contrast to the Second Circuit's framework, these courts have determined that facts alleging motive and opportunity are insufficient, standing alone, to establish a strong inference of scienter. *See, e.g., Comshare*, 183 F.3d at 551. Unlike the recklessness standard, the PSLRA does not codify or otherwise mention motive and opportunity. *Bryant*, 187 F.3d at 1285. Nevertheless, facts pertaining to the defendant's motive and opportunity are relevant where they "simultaneously establish that the defendant acted recklessly or knowingly, or with the requisite state of mind." *Comshare*, 183 F.3d at 551; *see also Bryant*, 187 F.3d at 1285–86 (holding that allegations of motive and opportunity may be relevant to a showing of severe recklessness); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 642 (E.D.Va. Sep.15, 2000) (same).

The Court finds that the reasoned approach most in accord with the language of the PSLRA is that a strong inference of scienter is not raised where a plaintiff merely alleges facts of a defendant's motive and opportunity to commit fraud. *See, e.g., Bryant*, 187 F.3d at 1285. Rather, under the PSLRA, a plaintiff must plead specific facts constituting strong circumstantial evidence of conscious misbehavior or recklessness in order to raise a strong inference. *See Comshare*, 183 F.3d at 551.

The Court's rationale for determining that the conscious misbehavior or recklessness standard survives the PSLRA is grounded in the statute and subsequent

interpretive case law. In *Greebel v. FTP Software, Inc.*, for example, the First Circuit ruled that Congress' explicit elimination of recklessness as a basis for imposing joint and several liability under the PSLRA does not mean that Congress implicitly rejected such a standard as a basis for *any* liability. 194 F.3d at 200. "Because joint and several liability is more onerous than individual liability, the exclusion of recklessness as the basis for imposing joint and several liability constitutes a recognition that some form of recklessness may suffice for individual liability." *Id.* Moreover, unlike the conclusion reached in *Silicon Graphics*, the Court agrees with the Eleventh Circuit's analysis that "had Congress wished to replace recklessness with actual knowledge with respect to the quantum of scienter required by § 78u–4(b)(2), it could have done so expressly ... instead of merely reciting that the 'required state of mind' must be plead[ed] with particularity." *Bryant,* 187 F.3d at 1284.

Although a plaintiff must plead scienter by alleging facts constituting conscious misbehavior or recklessness, the Court additionally concurs with those cases holding that motive and opportunity cannot, standing alone, raise a strong inference of scienter. *See, e.g., Comshare,* 183 F.3d at 551. By compelling a plaintiff to plead the defendant's "required state of mind" with particularity, the Congress did not use the term "motive and opportunity." *Bryant,* 187 F.3d at 1285; *Paracelsus,* 61 F.Supp.2d at 597. Nevertheless, allegations of motive and opportunity may be considered as a factor in determining whether a strong inference has been raised. *Eizenga,* 124 F.Supp.2d at 982.

In this case, having established that the Plaintiffs may allege motive and opportunity in conjunction with facts constituting strong circumstantial evidence of conscious misbehavior or recklessness, the Court will consider the Defendants' motion to dismiss the following claims asserted by the Plaintiffs: (1) the Defendants had the motive and opportunity to commit fraud based on the need to raise capital, incentive compensation contingent on the successful implementation of Project Renaissance, and Finley's insider stock sales; (2) the Defendants engaged in conscious misbehavior or were reckless as to their public representations because Lukens and Finley were intimately familiar with Baker's inadequate internal controls; and (3) the Defendants violated generally accepted accounting principles.

1.

In order to plead motive and opportunity, the Court turns to the standard originally articulated by the Second Circuit. However, as previously discussed, facts alleging motive and opportunity to commit fraud will not raise a strong inference of scienter unless they simultaneously establish that the defendant acted recklessly or consciously misbehaved. To plead motive, a plaintiff must state with particularity the concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. *Novak,* 216 F.3d at 307 (quoting *Shields,* 25 F.3d at 1130). Similarly, to plead opportunity, a plaintiff must allege specific facts as to the means and likely prospect of achieving concrete benefits by the means alleged. *Id.*

In this case, the Plaintiffs allege facts relating to three concrete benefits that contributed to the Defendants' motive and opportunity: (a) the Defendants' critical need to raise working capital for Baker; (b) incentive compensation resulting from the successful implementation of Project Renaissance; and (c) Finley's insider stock sales.

### a.

█ The Plaintiffs maintain that the Defendants had the motive and opportunity to commit fraud because of "Baker Hughes' dire need of capital." (Instrument No. 58, at 15). They cite to Baker's September 1999 shelf registration, in which Baker reported that it expected to use the net proceeds of up to one billion dollars in debt and equity securities for "working capital, acquisitions, and repayment of debts." (Instrument No. 48, at ¶ 58). According to the Plaintiffs, "it was critical for [Baker] to raise further capital and it had appeared that a window had arisen in the fall of 1999 to facilitate [Baker's] cash needs." (*Id.*). The Defendants allegedly concealed Baker's accounting control problems to ensure the success of the scheduled $200 million debt offering. (*Id.* at ¶ 62). The Plaintiffs attempt to bolster their position that Baker was in critical need of working capital by arguing that the scheduled debt offering was more financially advantageous to Baker than utilizing its existing credit facility. (Instrument No. 58, at 17–18).

In response, the Defendants maintain that the facts establish that Baker was a financially sound company. They contend that the $200 million offering was a small amount and that no analyst reports made any reference to a capital crisis. (Instrument No. 53, at 15–16). Even assuming the existence of a capital shortfall, the Defendants argue that a dismissal is warranted because a company's need to raise capital is deficient as a matter of law to raise a strong inference of scienter. (*Id.* at 16–17).

Initially, the Court notes that disputes over the realities of Baker's financial health are not properly resolved in the present motion. In a motion to dismiss under Rule 12(b)(6), the Court accepts as true all allegations contained in the plaintiff's complaint. *Kaiser Aluminum &*

*Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982). Consequently, the Court will assume for purposes of this motion that, as alleged, Baker scheduled the $200 million debt offering in order to replenish its need for capital.

The Court finds that the Plaintiffs' facts as to Baker's need to raise capital fail to adequately raise a strong inference of scienter. The primary deficiency in the Plaintiffs' complaint as to this allegation is that it fails to allege, and there is no evidence, that the Defendants would personally profit from the debt offering. *See Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir.1994) (holding "defendants' motive to commit securities fraud is not readily apparent, as there is no allegation that [they] actually personally profited from ... the money raised from the two offerings"); *see also In re Baan Co. Sec. Litig.,* 103 F.Supp.2d 1, 19–20 (D.D.C.2000) (holding that defendant's secret use of company stock as collateral in order to secure a $700 million loan insufficient because plaintiffs failed to allege the loan was used for personal gain). Although the Plaintiffs attempt to link the alleged misrepresentations of the accounting issues to other personal-gain motives like incentive compensation and insider trading, there is no claim that the cancelled debt offering would have resulted in any personal benefit to the Defendants. Instead, the Plaintiffs' generalized allegation that Baker was in dire need of capital relies on a imprecise motive that is "possessed by virtually all corporate insiders." *Novak,* 216 F.3d at 307; *see also Glickman v. Alexander & Alexander Servs., Inc.,* No. 93 Civ. 7594(LAP), 1996 WL 88570, at *6 (S.D.N.Y. Feb.29, 1996) (holding that "a desire to raise much needed capital" is too broad and generalized of a motive to raise a strong inference of scienter).

Furthermore, the majority of cases addressing this motive have decidedly held that a generalized desire to raise capital is inadequate to raise a strong inference of scienter as a matter of law. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co., Inc.*, 75 F.3d 801, 813–14 (2d Cir.1996); *Mortensen II*, 123 F.Supp.2d at 1024; *Leventhal v. Tow*, 48 F.Supp.2d 104, 115 (D.Conn.1999); *In re 1993 Corning Sec. Litig.*, No. 93 Civ. 7015(AGS), 1996 WL 257603, at *7 (S.D.N.Y. May 15, 1996); *Feasby v. Industri–Matematik Int'l Corp.*, No. 99CIV.8761 (HB), 2000 WL 977673, at *4 n. 5 (S.D.N.Y. July 17, 2000). These courts have rejected the notion that a defendant's desire to "maximize the marketability of debt securities and to minimize interest rates" sufficiently alleges scienter. *Leventhal*, 48 F.Supp.2d at 115. In *Mortensen v. AmeriCredit Corp.*, 123 F.Supp.2d 1015, 1016–17 (N.D.Tex.1999) ("*Mortensen I* "), the plaintiffs alleged that the defendant artificially inflated financial results in order to issue $125 million of senior notes "on more favorable terms to itself." 123 F.Supp.2d at 1016–17. The court held that the plaintiffs' claim was an "unsupported, generalized allegation of motive that is insufficient as a matter of law." *Id.* at 1017; *see also San Leandro*, 75 F.3d at 813–14 (holding as an insufficient motive the plaintiffs' allegation that the defendants created an illusion of profitability in order to maximize the marketability of $700 million of debt securities and minimize the interest rates of the securities).

The Plaintiffs attempt to distinguish their facts from "a garden-variety raising capital animus," *Coates II*, 100 F.Supp.2d at 431, by arguing that the Defendants did not merely wish to raise capital, but were instead in desperate need of more money. (Instrument No. 58, at 19). Several courts have ruled that sufficiently particularized facts alleging the need to raise capital can be probative of scienter. *See, e.g., Mi-croStrategy*, 115 F.Supp.2d at 648–49. The Plaintiffs specifically cite as support the court's decision in *In re Kidder Peabody Sec. Litig.*, No. 94 CIV. 3954(JFK), 1995 WL 590624, at *5 (S.D.N.Y. Oct.4, 1995). In *Kidder*, the defendants were accused of hiding or recklessly disregarding a scheme to generate false profits for the company. Following the company's acquisition by General Electric Company, the defendants' company had to show profitability in order to obtain "badly needed bank financing." *Id.* Although, like *Kidder*, the Plaintiffs in this case allege that "it was critical to [Baker] to raise further capital," (Instrument No. 48, at ¶ 58), there is no allegation that the $200 million debt offering was Baker's only means of potential financing. Indeed, in their response to the Defendants' motion, the Plaintiffs explain in depth that, although Baker could have utilized its credit facility, "the debt offering was far more advantageous." (Instrument No. 58, at 18). Whereas the *Kidder* defendants' company was in straits to find *any* financing, the Plaintiffs have not alleged a similar situation here.

Additionally, the mere fact that the Plaintiffs have averred the "critical" need for debt financing does not automatically qualify their claim as sufficiently particularized. The Plaintiffs argue that, unlike the complaint in *Coates II*, they have "detailed the reasons why Baker Hughes was in dire need of capital." (Instrument No. 58, at 19). In *Coates II*, the court dismissed the plaintiffs' complaint because, *inter alia*, "the amended complaint contain[ed] no specific allegations to support the conclusory assertion that the debt exchanges were 'badly needed.'" 55 F.Supp.2d at 644 n. 25. However, the *Coates II* holding cannot be read to mean that a plaintiff's simple reference to "badly needed" or otherwise "critical" financing warrants a strong inference of scienter. In any event, as in *Coates II*, there are no

particularized facts indicating that the proposed debt offering was itself "badly needed" or otherwise critical. As the Plaintiffs themselves plead in their complaint, Baker could have alternatively raised revenue by utilizing its credit facility. (Instrument No. 58, at 18).

Even were the Court to find that an allegation of Baker's critical need for capital is sufficient to raise an inference of scienter, the Plaintiffs' claim does not raise the *strong* inference required by the PSLRA. *See Corning*, 1996 WL 257603, at *6–7. In *Corning*, the plaintiffs alleged in detail "Corning's need for additional capital following its acquisition of Damon Corp.... [and] Corning's offer and sale of nearly $100 million of Debentures." *Id.* at *6. The plaintiffs argued that Corning withheld the release of adverse financial information until after the debenture offering because "a negative market reaction could have resulted in the proposed financing being cancelled or postponed, or Corning not being able to raise the amount it desired or raising money on less favorable terms." *Id.* In support of its claim, the plaintiffs argued that, although the debenture offering was successful, Corning was forced to postpone a $400 million stock offering due to the release of the negative financial information. *Id.* at *7. In rejecting the plaintiffs' allegation of motive, the court held that not even a reasonable inference of scienter had been raised because "[i]f [d]efendants' intent was to perpetrate a fraud to raise capital by delaying disclosure of adverse information, may it not also be inferred that [d]efendants would have delayed the announcement of this information even further so as not to have endangered the far larger $400 million stock offering?" *Id.* The court concluded that the plaintiffs' allegation "defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent." *Id.*

Like *Corning*, the Plaintiffs in this case do not plead any facts to explain why Baker's announcement of accounting issues occurred before it was to launch the allegedly "critical" debt offering. As the *Corning* court aptly expressed, may it not also be inferred here that the Defendants would have delayed the announcement of the accounting issues so as not to endanger the badly needed $200 million in financing? *See id.* Accordingly, the Plaintiffs' allegations of motive based on the need to raise capital fail to raise the requisite strong inference of scienter.

**b.**

The Plaintiffs plead that the Defendants were motivated to conceal Baker's internal control problems because they were eligible for incentive awards which "were based, in part, on the success of Project Renaissance." (Instrument No. 48, at ¶ 97). According to the Plaintiffs, Project Renaissance ("Project") was created in 1998 "to cut costs and streamline internal control systems that, after a decade of merger and acquisition activity, left [Baker's] accounting in disarray." (*Id.* at ¶ 41). They contend that the Defendants made materially false and misleading statements by failing to disclose that the Project was created to fix accounting problems. (*Id.* at ¶ 86). The essence of the Plaintiffs' argument is that the "Defendants could only receive [incentive] compensation if the [Project] appeared to be successful. The [Project], in turn, could only appear successful if the accounting misstatements remained hidden." (Instrument No. 58, at 22).

The Defendants assert that the documentary evidence is not clear that 1999 year-end bonuses were tied to the Project. (Instrument No. 64, at 10). Even assuming they were linked, however, the Defendants maintain that there was no logical reason why the Defendants would an-

nounce the accounting issues three weeks prior to the end of the year. (*Id.*). Additionally, because virtually every corporate insider's compensation is tied to his company's financial performance, the Defendants argue that permitting the Plaintiffs' allegation would "destroy the scienter pleading requirement." (*Id.* at 11).

The Court finds that the Plaintiffs' allegations of motive and opportunity based on incentive compensation fail to raise a strong inference of scienter. On their face, the Plaintiffs' facts do not establish a coherent theory of liability based on the Defendants' interest in obtaining incentive compensation. Without specifically stating any dates, the Plaintiffs contend that Lukens and Finley made fraudulent statements during their tenures as chief executive officer and chief financial officer, respectively. (Instrument No. 58, at 23). They allege that "the misleading statements concerning adequacy of Baker Hughes' system occurred during Lukens' tenure as Chief Executive Officer [from 1996 until 1999] and Finley's tenure as Chief Financial Officer [from 1993 until 1995]. In those positions, Lukens and Finley were privy to information concerning the deficiencies in [Baker's] accounting practices." (*Id.*). Despite the Plaintiffs' assertion that the Project's success was a financial motive for the Defendants to conceal the accounting problems since 1998, there is no allegation in the complaint to explain what motive Lukens and Finley would have had to hide the problems as early as 1993, but at least by 1996, when the Project is not alleged to have yet been in existence.

Furthermore, even were the Court to indulge the Plaintiffs' claim that the Defendants were motivated to disguise Baker's problems because of the potential for incentive compensation, there is no allegation that the "success" of the Project depended on the non-existence of the type of problems allegedly hidden by the Defendants. The Plaintiffs only allege in a conclusory fashion that the Project "could only appear successful if the accounting misstatements remained hidden." (Instrument No. 58, at 22). Additionally, although they argue in their brief that the incentive compensation "was contingent on meeting—or appearing to meet—goals pertaining to the correction of the accounting problems plaguing Baker," (Instrument No. 58, at 21), the complaint, in contrast, alleges that the Project's purpose of correcting the accounting problems were fraudulently hidden from the public. (Instrument No. 48, at ¶ 86).

In support of their claim, the Plaintiffs contend that their allegations, in conjunction with their other facts, are sufficient to satisfy the PSLRA's scienter requirement. (Instrument No. 58, at 21). They cite the court's decision in *In re Digi Int'l, Inc. Sec. Litig.*, 6 F.Supp.2d 1089, 1098 (D.Minn.1998), for the proposition that incentive compensation constitutes scienter where a defendant's performance-based compensation could be enhanced significantly by inflated financial results. Although the *Digi* court found that the plaintiffs' allegations of incentive compensation were sufficient to allege conscious misbehavior, the Plaintiffs in this case have not alleged any facts that Lukens and Finley's compensation would similarly be "enhanced significantly." *See id.* Generally alleging, as the Plaintiffs have done here, that the Defendants would benefit financially from the success of the Project "would effectively eliminate the state of mind requirement as to all corporate officers and defendants." *Melder*, 27 F.3d at 1102; *see also Ferber v. Travelers Corp.*, 785 F.Supp. 1101, 1107 (D.Conn.1991) (holding that "[i]t does not logically follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent").

In this case, the pleaded facts pertaining to the Defendants' potential for incentive compensation does not raise a strong inference of scienter.

### c.

The Plaintiffs assert that their complaint raises a strong inference of scienter because Finley sold over 21,000 shares of his Baker stock on May 5, 1999, approximately seven months prior to the announcement of the accounting issues. According to the Plaintiffs, Finley sold his shares "at $30.88 per share for proceeds of $666,205, thus, illegally profiting from Baker Hughes' false statements." (Instrument No. 48, at ¶ 12).

In reply, the Defendants argue that scienter has not been established because Finley's stock sales are not suspicious. They note that, at the time of the sales, Finley had not yet been appointed CFO and the shares were transacted seven months prior to the disclosure of the accounting problems. (Instrument No. 64, at 12). Furthermore, the Defendants note that "Finley continued to retain the vast majority of his Baker Hughes securities," and that Lukens never sold any of his stock during the class period. (*Id.* at 13).

■ The Court finds that the Plaintiffs' allegation is sufficient to raise an inference of scienter, although not one as strong as required by the PSLRA. The federal courts addressing insider stock sales have held that only extraordinary trading activity suffices to raise a strong inference of scienter. *In re First Union Corp. Sec. Litig.*, 128 F.Supp.2d 871, 897 (W.D.N.C. Jan.10, 2001) (citing *Greebel*, 194 F.3d at 185). In assessing whether a stock sale qualifies as extraordinary or unusual, the Court will consider the percentage of stock sold, past trading practices, and whether any other defendants also sold stock. *See Baan*, 103 F.Supp.2d at 19 (construing *Advanta*, 180 F.3d at 540–41); *Marksman Partners, L.P. v.*

*Chantal Pharm. Corp.*, 927 F.Supp. 1297, 1312–13 (C.D.Cal.1996); *Feasby*, 2000 WL 977673, at *4 n. 5.

■ In this case, the Plaintiffs have only alleged some of the elements adequate to raise a strong inference of scienter. For example, the complaint details that Finley sold over 21,000 shares at just over $30 per share for a total of approximately $666,205. (Instrument No. 48, at ¶ 12(b)). Although the Plaintiffs have pleaded the number of shares sold, the sell price, and the alleged illegal profit obtained thereby, they have nevertheless failed to "provide[ ] enough information about these sales to make them sufficient evidence of motive in themselves." *Baan*, 103 F.Supp.2d at 19 (denying insider stock sales as a motive to raise a strong inference of scienter where plaintiffs failed to plead defendants' stock sale history and percentage of stock sold); *see also Marksman*, 927 F.Supp. at 1312–13 (holding plaintiffs adequately pleaded scienter where defendant sold 20 percent of his stock and had not sold any in the previous 3 years).

Like the insider trading allegation in *Baan*, the Plaintiffs in this case have failed to plead Finley's past trading practices or the percentage of personal stock he sold. Although the Plaintiffs contend in their brief that Finley's insider trading constituted 37 percent of his personal shares in Baker, (Instrument No. 58, at 24), that percentage figure "encompass[es] a level of particularity that does not exist in the Complaint and it is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." *O'Brien v. National Prop. Analysts Partners*, 719 F.Supp. 222, 229 (S.D.N.Y.1989); *see also Coates II*, 55 F.Supp.2d at 644 n. 26 (holding plaintiffs cannot rely on an allegation not contained in the complaint). Even were the Court to accept the Plain-

tiffs' argument in their brief that Finley's sales constituted 37 percent of his personal stock, the Plaintiffs nevertheless fail to raise a strong inference of scienter because there is no allegation pertaining to Finley's trading history. Absent any particularized claim from the Plaintiffs in their complaint to the contrary, there is nothing precluding an inference that Finley's sales are consistent with his prior sales of Baker stock.

■ Additionally, the Plaintiffs' claims are inadequate to raise a strong inference of scienter because there is no allegation that Lukens, the former CEO and chairman at Baker, sold any of his personal stock during the class period. Although Lukens' lack of stock sales is not necessarily dispositive in pleading a strong inference of scienter, it is a relevant factor the Court may consider. *See Acito v. IMC-ERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (holding that "[t]he fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim" of scienter based on an insider trading motive); *see also Leventhal*, 48 F.Supp.2d at 114 (holding insider trading motive did not raise requisite inference of scienter where two of five defendants did not sell their personal stock during class period). Taking these factors together, the Plaintiffs' allegations pertaining to Finley's stock sales do not raise a strong inference of scienter as required by the PSLRA.

In sum, even were the Court to find that allegations of motive and opportunity, standing alone, are capable of raising a strong inference of scienter, the Plaintiffs have failed to plead specific facts to raise such an inference.

### 2.

The Plaintiffs must plead the Defendants' conscious misbehavior or recklessness in order to raise a strong inference of scienter under the PSLRA. In plead-

ing conscious misbehavior, the Plaintiffs must "identif[y] circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Tuchman*, 14 F.3d at 1068. Pleading conscious misbehavior is a stringent standard which requires strong circumstantial evidence. *Coates II*, 55 F.Supp.2d at 638.

■ Similarly, in alleging recklessness, the Plaintiffs are not allowed to plead that the Defendants were merely negligent. *Comshare*, 183 F.3d at 542 (holding that "recklessness" has a "stringent formulation ... that does not allow for recklessness as a form of negligence"). Rather, the Plaintiffs must plead particularized facts that the Defendants "acted with a severely reckless state of mind." *Bryant*, 187 F.3d at 1283. Severe recklessness involves an "extreme departure from the standards of ordinary care[ ] that present[s] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Coates II*, 55 F.Supp.2d at 640–41 (quoting *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993)). Nevertheless, a plaintiff's pleading obligation under the recklessness standard does not require him to demonstrate actual knowledge on the defendant's part. *Bryant*, 187 F.3d at 1284 (holding that Congress would have expressly mandated actual knowledge in pleading scienter under the PSLRA had it intended to replace the recklessness standard). *But see Silicon Graphics*, 183 F.3d at 970 (holding that the PSLRA requires that a plaintiff plead a "deliberate or conscious recklessness" that "strongly suggests actual intent"). In raising a strong inference of scienter, " '[r]eckless' in this context is viewed as a lesser form of intent, rather than merely a greater degree of ordinary

negligence." *In re Criimi Mae, Inc. Sec. Litig.*, 94 F.Supp.2d 652, 660 (D.Md.2000).

■ Here, the Plaintiffs attempt to allege facts that would constitute strong circumstantial evidence of conscious misbehavior or recklessness. They contend that the Defendants knew, or recklessly disregarded, that their public representations about Baker were materially false and misleading. (Instrument No. 48, at ¶ 95). As senior officers, Lukens and Finley allegedly "received daily, weekly and monthly financial reports to apprise them of the true financial status of Baker Hughes. [Lukens and Finley] w[ere] actively involved in [Baker's] day-to-day operations, including, among other things, the setting and implementation of [Baker's] policies and strategies." (*Id.*). In response, the Defendants contend that there are no particularized allegations that the Defendants were aware of any accounting issues at INTEQ prior to Baker's public announcement on December 8, 1999. (Instrument No. 64, at 14). Additionally, despite the complaint's reference to "daily, weekly and monthly financial reports," the Defendants argue that there is no specificity as to "the author, title or date for any of these alleged documents." (*Id.* at 15).

The Court finds that the Plaintiffs' complaint sets forth the type of generalized allegations routinely rejected as failing to raise a strong inference of scienter. *See, e.g., Criimi Mae*, 94 F.Supp.2d at 661. In *Criimi Mae*, for example, the plaintiffs claimed that Criimi Mae, Inc.'s ("CMI") officers consciously or recklessly caused CMI to disclose materially false and misleading statements. *Id.* The plaintiffs alleged that the officers were responsible for CMI's day-to-day activities and privy to information reflecting the truth about CMI's finances. *Id.* The court held that the plaintiffs' facts were insufficient to raise a strong inference of scienter because "[i]f they were, every corporate executive who participates in the day-to-day management of his company would be exposed to liability for securities fraud." *Id.; see also Eizenga*, 124 F.Supp.2d at 984 (holding that the plaintiffs' recklessness allegations were inadequate where they simply pleaded that the defendants were " 'hands-on' managers who monitored performance through detailed reports").

Like *Criimi Mae* and *Eizenga*, the Plaintiffs in this case plead generalized allegations that the Defendants were intimately familiar with Baker's daily operations and were otherwise knowledgeable of Baker's actual financial situation. The Plaintiffs characterize, as the plaintiffs in *Criimi Mae*, that Lukens and Finley were senior Baker officers who had "access to material, non-public information[ ][and] knew that the adverse facts ... had not been disclosed to and were being concealed from the public." (Instrument No. 48, at ¶ 15). Additionally, the Plaintiffs' complaint generally alleges that the Defendants "each received daily, weekly and monthly financial reports to apprise them of the true financial status of Baker." (*Id.*, at ¶ 95). In pleading that the Defendants possessed reports containing adverse information which was subsequently concealed, the Plaintiffs must identify those reports. *See Eizenga*, 124 F.Supp.2d at 985 (citing *Novak*, 216 F.3d at 309). Although they elude to "daily, weekly and monthly financial reports," the Plaintiffs fail to further specify the contents of the alleged reports' information, and how or why the Defendants were reckless or consciously misbehaved with respect to this information. Accordingly, the Plaintiffs have not pleaded particularized facts as to the Defendants' conscious misbehavior or recklessness sufficient to raise a strong inference of scienter.

**3.**

■ The Plaintiffs argue that they have raised a strong inference of scienter

because the Defendants violated the requirements of generally accepted accounting principles, or GAAP. (Instrument No. 48, at ¶ 78). A violation of GAAP, standing alone, does not satisfy the pleading standards established by the PSLRA. *See, e.g., Novak,* 216 F.3d at 309. In the absence of additional facts specifying fraudulent intent or the defendant's state of mind, GAAP errors "merely suggest that either management or the accountant missed something, and may have failed to prepare or review the financial statements in accordance with an accepted standard of reasonable care." *Reiger v. Price Waterhouse Coopers LLP,* 117 F.Supp.2d 1003, 1010 (S.D.Cal. Oct.2, 2000); *Chill v. General Elec. Co.,* 101 F.3d 263, 270 (2d Cir. 1996).

■ In this case, the Plaintiffs complain that, "[a]s a result of defendants' accounting improprieties," (Instrument No. 48, at ¶ 79), the Defendants violated various GAAP provisions. The Defendants allegedly failed to: "provide [useful] information" to investors in their reporting; "provide information about the economic resources of [Baker]"; "provide information about how management ... has discharged its stewardship responsibility"; and "provide information about an enterprise's financial performance during a period." (*Id.*). Additionally, the Plaintiffs maintain that the Defendants' financial reports were incomplete and did not represent what they purported to represent. (*Id.* at ¶¶ 79(e)–81). According to the Plaintiffs, the GAAP violations are most clearly reflected in Baker's retained earnings. Whereas Baker had retained earnings of $66.1 million at the end of 1998, the restatement resulted in a deficit of $51.5 million at the end of 1999. (*Id.* at ¶ 4).

The Plaintiffs urge the Court to consider the GAAP allegations in light of the pleaded facts as to the Defendants' motive and opportunity, and conscious misbehavior or recklessness. Even viewing these facts in totality, however, the Plaintiffs' GAAP allegations do not raise a strong inference of scienter. The Plaintiffs have done nothing more than refer to figures pertaining to reduced retained earnings as evidence of GAAP violations. However, "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *Fine v. American Solar King Corp.,* 919 F.2d 290, 297 (5th Cir.1990). The Plaintiffs' allegations do not specify with particularity that the Defendants knew they were violating GAAP principles, or were otherwise severely reckless in releasing Baker's financial reports. Indeed, their complaint concedes that the accounting issues were "improprieties." (Instrument No. 48, at ¶ 79). An accounting "impropriety" is a term of art understood to be an error of any sort. *See In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248, 1274 (N.D.Cal. Sep.28, 2000). An accounting "irregularity," on the other hand, represents "fraudulent financial reporting undertaken to render statements misleading." *Paracelsus,* 61 F.Supp.2d at 599. In *Paracelsus,* the court held that "factual allegations that a company has *admitted* to intentional misstatements or omissions, or to fraudulent financial reporting, are sufficient to meet the heightened pleading standard of the PSLRA *if* those admissions are made with regard to each of the false statements that the complaint alleges were made with scienter." *Id.*

Here, the Plaintiffs' complaint alleges that the Defendants violated GAAP, by committing accounting "improprieties," with scienter. Despite the Plaintiffs' reference to restated financial figures, there are no particularized facts relating to the specific way in which the Defendants' accounting strayed from GAAP precepts. The generalized principles that the Plaintiffs accuse the Defendants of violating in

their complaint do not speak to any fraudulent intent the Defendants may have harbored in their public representations pertaining to Baker's finances.

In conclusion, the Court finds that the totality of the Plaintiffs' facts has failed to raise a strong inference of scienter. Although the facts are insufficient when viewed in the aggregate, it is not error for the Court to, as it did here, compartmentalize the allegations and "wipe the slate clean after considering each component." *Coates II*, 55 F.Supp.2d at 645. Accordingly, the Court finds that the Plaintiffs' section 10(b) and Rule 10b–5 claims are **DISMISSED.**

### B.

The Defendants assert in their motion that the Plaintiffs have failed to state a claim because the alleged public misrepresentations are not material. (Instrument No. 53, at 29–30). Because the Court finds that the Plaintiffs have failed to raise a strong inference of scienter, however, it need not reach the issue of materiality.

### IV.

The Defendants do not specifically seek dismissal of the Plaintiffs' section 20(a) claim. Because the Court dismisses the Plaintiffs' underlying securities law claims under section 10(b) and Rule 10b–5, however, the section 20(a) claim for controlling person liability must also be dismissed. *See Mortensen,* 123 F.Supp.2d at 1028.

Accordingly, the Court finds that the Plaintiffs' section 20(a) claim is **DISMISSED.**

### V.

Based on the foregoing, the Court finds that the Defendants' motion to dismiss the Plaintiffs' consolidated amended class action complaint (Instrument No. 53) is **GRANTED.**

The Clerk shall enter this Order and provide a copy to all parties.